STATE OF CONNECTICUT *v.* JOEL B. MILLSTEIN
(2819)

HULL, DALY and BIELUCH, Js.

Argued April 2—decision released August 26, 1986

*W. Paul Flynn,* with whom was *Howard A. Lawrence,* for the appellant (defendant).

*Susann E. Gill,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, *Kevin McMahon,* assistant state's attorney, and *Mary Glassman,* law student intern, for the appellee (state).

HULL, J. After a jury trial, the defendant was convicted of arson in the second degree, a violation of General Statutes (Rev. to 1979) § 53a-112. He now appeals

from the judgment of conviction rendered on the verdict, claiming that the trial court erred: (1) in admitting into evidence statements he made to the police; (2) in permitting the state to make reference to an ethnic stereotype in its examination of several witnesses and in its closing argument; (3) in refusing to strike, as violative of Practice Book § 755, testimony given by a police officer;[1] (4) in admitting "identification" testimony; and (5) in denying his motion for judgment of acquittal. We find no error.[2]

The jury reasonably could have found the following facts. Shortly after 11 p.m., on July 10, 1980, three youths who were riding their bicycles on Main Street in Glastonbury noticed smoke coming from Augie's Restaurant. One of the young men went to the nearby police station and reported the fire. The officer who received the information arranged to have the fire department notified and then proceeded to the restaurant. On arriving at the scene of the fire, the officer checked the perimeter of the building and saw that the front doors were unlocked and that one of the doors was ajar. Shortly after the officer completed his initial check of the area, members of the fire department arrived. They immediately smelled gasoline and one of the firefighters noticed that the floor was slippery and covered with some kind of liquid. Later, the firefighters discovered three plastic containers which held an

---

[1] Practice Book § 752 provides: "After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

Pursuant to Practice Book § 755, if the prosecution chooses not to comply with the court's order to disclose the statement, "the judicial authority shall strike from the record the testimony of the witness . . . ."

[2] The defendant's failure to include references to the transcript in his statement of facts as required by Practice Book § 3060F (c) has severely limited our ability to review his claims of error.

orange liquid that later was determined to be gasoline, behind the restaurant's food counter. A fourth container was found near the locked and bolted rear door. The defendant filed a claim against his insurance company for the damage the fire caused to the restaurant.

For several months preceding the fire, business had dropped off at Augie's. Many of the restaurant's suppliers had reduced their credit terms from thirty days to seven days, and then to cash on delivery. On a few occasions during this time period, the defendant approached friends and discussed selling either Augie's, or his other business, Dave's Original Bagels. In the year before the fire, the defendant had discussed burning down one of his businesses with two individuals and had offered money to one of them to do so.

Approximately eight months before the fire, the defendant called his insurance agent and asked that the coverage on Augie's be increased from $41,000 to $135,000. The agent felt that the amount the defendant wanted was disproportionate to the value of the building and its contents. In addition, the defendant was already behind in paying his premiums. The agent therefore refused the requested increase. Either the day of, or the day before the fire, the agent called the defendant and informed his wife that the insurance on the restaurant would be cancelled unless he received at least a $1000 payment on the outstanding balance within ten days.

On the day of the fire, the defendant called his nephew, who worked at a gas station, and told him that he had run out of gasoline. As a result of this call, the nephew put two and one-half gallons of gas in the trunk of the defendant's car. At around 8 p.m. that evening, Alan Mitchell, the father of one of the defendant's employees, saw an individual pull his car up to the side door of the restaurant. Mitchell noticed that the individual, whom he thought was the defendant, was

unloading things from his trunk. He, therefore, went over to offer help. Mitchell took a box, in which he saw four plastic containers with an orange liquid in them, into the restaurant. Later in the evening, the defendant returned to the restaurant and, using the gasoline as an accelerant, set fire to the building.

The defendant first claims that the police elicited certain statements from him in violation of his right to remain silent as guaranteed by the fifth amendment to the United States constitution and interpreted by the United States Supreme Court in *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He argues that the trial court therefore erred in allowing a police officer to testify as to the substance of the statements. Because the defendant withdrew his objection to the admission of the testimony at trial, we decline to review this claim of error.

At trial, the state sought to elicit testimony from Steven Oborski, a Glastonbury police officer, concerning certain statements the defendant had made to him. The defendant objected arguing, inter alia, that his oral statements to Oborski were inadmissible because he had not been told, pursuant to the United States Supreme Court's decision in *Miranda* v. *Arizona,* supra, that he had a right to remain silent. The defendant argued that he was entitled to *Miranda* warnings because, at the time the questions were asked, the police had begun to focus their investigation on him. The trial court recessed court to allow defense counsel time to research the issue. When court reconvened, defense counsel conceded "that the threshold question in regard to statements of the defendant is custody." He also stipulated that "there is no question [that the defendant] was not in custody at that time nor is there an issue of voluntariness, that he was [at the police station] voluntarily . . . ." Counsel then expressly withdrew his *Miranda*-based objection.

In general, "appellate review of all issues, even constitutional issues, [is limited] to those on which the trial court has had an opportunity to rule. Practice Book § 3063 . . . ." *State* v. *Reddick,* 197 Conn. 115, 125, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). Where a party makes an objection and then withdraws it, the trial court has no such opportunity. The defendant has not shown, nor does the record reveal, any exceptional circumstances which would persuade us to exempt this case from the general rule. Accordingly, we decline to review this claim of error.[3] See *State* v. *Miner,* 197 Conn. 298, 305, 497 A.2d 382 (1985) (claim of error in admission of testimony unreviewable where objection to admission withdrawn at trial and where record inadequate as a result).

The defendant's second claim is that he was deprived of a fair trial by the state's use of the term "Jewish lightning" in its examination of several different witnesses and in its closing argument, and by the trial court's use of the term during its instruction to the jury.

---

[3] We decline as well to review this claim under the fundamental rights-fair trial exception of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Under *Evans* and its progeny, appellate review of claims of error which were not properly preserved at trial will be reviewed only in the rare circumstances where a defendant asserts deprivation of a fundamental constitutional right and a fair trial and the record adequately supports that claim. *State* v. *Cosby,* 6 Conn. App. 164, 167, 504 A.2d 1071 (1986). The defendant has satisfied the first prong of *Evans* by alleging violation of his right to remain silent as guaranteed by the fifth amendment to the United States constitution. The record, however, does not adequately support the defendant's claim that he was deprived of this right.

The United States Supreme Court has held that the fifth amendment to the United States constitution requires the police to inform an individual of his right to remain silent. *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). This requirement applies, however, only where the individual is in custody and subject to interrogation. At trial, the defendant's counsel conceded that the defendant was not in custody. Accordingly, the record does not support the defendant's claim that admission of the statements violated his fifth amendment rights.

According to the defendant, the use of this term encouraged the jurors to form an inference of guilt based not on the evidence but on an ethnic stereotype: that Jews as a character trait commonly commit arson to defraud insurance companies rather than suffer business failures. The state argues that this court should not review this issue because the defendant never objected on this ground at trial. We agree with the state's position.

The challenged references to the term "Jewish lightning" arose in the following situations. To establish a motive for the arson, the state called several members of the "coffee group," regulars at Augie's who were friends of the defendant. They testified about the decline in the defendant's business, the defendant's financial troubles, and his attempts to sell the restaurant. During the direct examination of Rocco Malena, one member of the group, the state asked whether the defendant had ever said anything about what he wished would happen to the business. Malena answered that the defendant had expressed a hope that the building would burn down. When cross-examining Malena, defense counsel, in an attempt to cast doubt on the seriousness of the defendant's statement, first referred to "Jewish lightning" in the following manner:

"[Defense Counsel]: Wouldn't it be fair to say that the coffee group and joking around, you used to joke with [the defendant] about 'Jewish lightning' and his business?

"[Malena]: Oh, definitely.

"[Defense Counsel]: You know that Joel Millstein is Jewish?

"[Malena]: Right.

"[Defense Counsel]: That was kind of a joke among the guys because he was involved in a restaurant business and he is Jewish: right?

"[Malena]: Um hum."

In an attempt to rebut the implication raised during cross-examination that the defendant had been joking when he said he wished his building would burn down, the state, during its redirect examination of Malena, referred to "Jewish lightning" as follows: "This joking about 'Jewish lightning' was a general thing but he wished it would burn down two or three months before the actual fire?" When Malena refused to acknowledge any distinction, the state pressed this point stating: "Are you saying that you took the way he was talking two or three months before the fire in a more serious vein than your normal joking about Jewish Lightning?" Malena still refused to acknowledge any distinction.

The third challenged reference to "Jewish lightning" made by the state occurred when Ronald Molina, another member of the coffee group, was being examined on direct. The state asked Molina whether it was "a regular topic—the term 'Jewish lightning' that came up in your conversation?" Again, during the examination of Ronald Cheney, yet another member of the group, the state asked whether the talk about "Jewish lightning" was a common topic. Cheney responded that the topic "came up." Thereafter, the term was mentioned by the state, defense counsel and witnesses in relation to the coffee group's conversations.

During closing argument, the state reviewed the evidence given by the coffee group members and, in so doing, made the following reference to "Jewish lightning": "I am just going to hit some of the highlights of each of the testimony. We have Mr. Cheney, Mr. DeBella. These are the friends, Ron [Molina], Rocky Malena, Butch D'Alessandro and Paquin. Ron Cheney,

said [the defendant] wanted to sell the business, said business was off, employee problems, 'Jewish lightning' . . . . Ron [Molina] said business 'definitely dropped off,' employee problems, 'Jewish lightning.' . . . Some other interesting comments by Rocco Malena, he said that on two or three occasions, the defendant said that he wished the business would burn down. Has 'Jewish lightning' gone down to a wish, a sentiment, an intent, a motive? Is it forming at this time?''

The final reference to which the defendant objects was made by the trial court during its charge to the jury. While instructing the jury, the court charged that it could "consider and give such weight as [it felt] appropriate to the comments from the members of the coffee group concerning the constant or apparently continual reference to 'Jewish lightning' and the business.''

While the defendant now claims that the use of the term "Jewish lightning" deprived him of his right to a fair trial, he never objected or excepted to the state's or the trial court's use of the term. Nor did he request that the jury be cautioned against drawing a prejudicial inference, or move for a mistrial. This court has recently reiterated the general rule that " 'where a criminal defendant does not object and take exception to allegedly prejudicial remarks of the state's attorney, either at the time they were made or at the close of argument, he waives his right to press the claimed error on appeal. *State* v. *Lubesky,* 195 Conn. 475, 484, 488 A.2d 1239 (1985); *State* v. *Malley,* 167 Conn. 379, 387, 355 A.2d 292 (1974).' " *State* v. *Salz,* 8 Conn. App. 125, 138, 512 A.2d 921 (1986), quoting *State* v. *Chace,* 199 Conn. 102, 108, 505 A.2d 712 (1986).

This court may, of course, review a claim of error even absent the appropriate objection and exception if the challenged action constitutes plain error; Prac-

tice Book § 3063; or if the challenged action implicates a fundamental constitutional right and the record adequately supports the claim that the defendant was deprived of that right; *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Here, the defendant has claimed that the comments deprived him of his fundamental constitutional right to a fair trial and the record is adequate for us to review that claim. Accordingly, we next consider whether the defendant was deprived of his right to a fair trial. *State* v. *Newton,* 8 Conn. App. 528, 531, 513 A.2d 1261 (1986).

To show that a prosecutor's comments deprived him of a fair trial, a defendant bears the burden of showing that the remarks were prejudicial in light of the entire proceeding. *State* v. *Binet,* 192 Conn. 618, 628, 473 A.2d 1200 (1984). "The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." Id. Our extensive review of the challenged portions of the testimony and the closing argument shows no unfairness in the proceedings. Contrary to the defendant's claim, the state did not use the term "Jewish lightning" in a manner which would invite or encourage the jurors to convict the defendant based on his ethnicity. Rather, the term was used by both defense counsel and the state as a shorthand way of saying arson. While we agree with the defendant that the use of the term in such a manner was highly offensive and inappropriate, we cannot agree with his further claim that its use deprived him of a fair trial. This is especially so given the overwhelming evidence of the defendant's guilt. Where evidence of guilt is substantial, prejudice is unlikely. We conclude that, under these circumstances, the defendant has not shown that he was prejudiced by the remarks.

The defendant also claims that the trial court's comments violated his due process right to a fair trial. The precise nature of this claim is not clear. It appears, however, that the defendant is in effect arguing that, through its charge, the court invited the jury to convict him based on his ethnicity, not on the evidence. We emphatically reject this claim. The use of the term "Jewish lightning" which the defendant challenges consisted of a single comment the court made when reviewing witness testimony: "You may also consider and give such weight as you feel appropriate to the comments from the members of the coffee group concerning the constant or apparently continual reference to 'Jewish lightning' and the business." While it would have been preferable for the court not to use the term, there is no support for the defendant's argument that in so commenting, the court was appealing to ethnic bias. Rather, the court was referring to the evidence in the same language used by defense counsel and then by the witnesses and the assistant state's attorney.

We acknowledge that " 'a jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended.' " *State* v. *Fernandez*, 198 Conn. 1, 12, 501 A.2d 1195 (1985), quoting *State* v. *Boyd*, 222 Kan. 155, 159, 563 P.2d 446 (1977). Additionally, we recognize the invidious and offensive nature of all stereotypes, racial, ethnic, religious, sexual or other. We must conclude, however, that in these circumstances the trial court's comments did not deprive the defendant of a fair trial. Accordingly, the record does not adequately support the defendant's claim that he was deprived of a fundamental constitutional right and we, therefore, decline to consider this claim of error.

In his third ground of error, the defendant challenges the trial court's failure to strike, pursuant to Practice Book § 755, testimony given by a police officer despite

the fact that statements he had previously made relating to the subject matter of his testimony were not available for inspection at trial. The state called officer Thomas McKee of the Glastonbury police department, the shift supervisor the night of the fire. McKee testified that he had informed the defendant of the fire. During cross-examination, McKee admitted that he had prepared a written report in connection with his conversation with the defendant. He was then asked if he had his report with him, and he indicated that he did not because the report had been lost. The state interrupted the questioning and acknowledged a duty under Practice Book § 752, Connecticut's version of the Jencks Act,[4] to disclose the statement. It then outlined the efforts that had been made to find the reports. The court noted the state's remarks but did not strike the witness' testimony.

The defendant now claims that the trial court erred by not striking the testimony. In so arguing, he relies on Practice Book §§ 752, 753 and 755. Under Practice Book § 752, "[a]fter a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified." Practice Book § 753 provides that where, as here, "[t]he entire contents of a statement requested under Sec. 752 relate to the subject matter of the testimony of the witness, the judicial authority *shall order the statement to be delivered* directly to the defendant and or his counsel for his examination and use." (Emphasis added.) If the prosecution chooses not to comply with the court's order to deliver the statement, "the judicial authority *shall strike* from the record the

[4] 18 U.S.C. § 3500.

testimony of the witness . . . . '' (Emphasis added.)
Practice Book § 755. Our Supreme Court has interpreted the provisions of Practice Book § 752 as mandatory. See *State* v. *Anonymous (83-FG),* 190 Conn.
715, 732, 463 A.2d 533 (1983); *State* v. *Gonzales,* 186
Conn. 426, 432, 441 A.2d 852 (1982). Accordingly, the
defendant argues that the trial court erred by not striking the testimony and claims that his conviction, therefore, must be reversed.

While the defendant is correct in claiming that the
requirements of Practice Book § 752 are mandatory,
he is incorrect in implying that the trial court always
lacks discretion to decide whether to strike witness testimony under Practice Book § 755. In several recent
cases; *State* v. *Vessichio,* 197 Conn. 644, 661, 500 A.2d
1311 (1985); *State* v. *Milum,* 197 Conn. 602, 617, 500
A.2d 555 (1985); *State* v. *Myers,* 193 Conn. 457, 467,
479 A.2d 199 (1984); and *State* v. *Shaw,* 185 Conn. 372,
386, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155,
102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982); our Supreme
Court considered whether a trial court must strike witnesses' testimony when otherwise discoverable statements they made are not produced at trial because of
unavailability. In those cases, our Supreme Court concluded that sanctions for nondisclosure are not automatic. Rather, the court held that under such
circumstances the decision on whether to strike the testimony should be resolved by applying a balancing test:
the extent of the state's culpability for failure to produce the statement weighed against the amount of prejudice to the defendant which resulted from nondisclosure. *State* v. *Shaw,* supra, 386; see also *State* v. *Zayas,*
3 Conn. App. 289, 295–96, 489 A.2d 380, cert. denied,
195 Conn. 803, 491 A.2d 1104 (1985).

Here, the record discloses very little culpability on
the state's part. The only testimony on this issue at trial
revealed that the statement was lost. There was no indi-

cation that it had been intentionally destroyed, or that it had been destroyed in accordance with routine police department practice. Cf. *State* v. *Myers,* supra, 467–70. Nor is there any indication that the defendant was in any way prejudiced by nondisclosure,[5] and the record shows that the defendant was given ample opportunity to cross-examine McKee, the maker of the missing statement. When faced with a similar situation in *State* v. *Shaw,* supra, our Supreme Court found "both halves of the balance opposed to the imposition of a sanction." *State* v. *Myers,* supra, 467. We conclude that the trial court did not err by reaching the same conclusion in this case.

In his fourth claim of error, the defendant challenges the trial court's decision to admit certain testimony which he characterizes as "identification testimony." The defendant does not allege an unnecessarily suggestive pretrial identification procedure. Nor does he contend that the courtroom setting was unnecessarily suggestive so as to taint the in-court identification. Rather, the defendant claims that the evidence should have been excluded because it was irrelevant in the light of the witness' uncertainty about a key point. We disagree.

It is the function of the trial court, not this court, to rule on the relevancy of offered evidence. "On appeal, we are limited in our review to a determination of whether, under the circumstances of the case, in exercising its broad discretion, the trial court could legally act as it did, and not whether we, under the same circumstances, would make the same ruling." *State* v. *Aspinall,* 6 Conn. App. 546, 554, 506 A.2d 1063 (1986).

---

[5] In *State* v. *Myers,* 193 Conn. 457, 469 n.7, 479 A.2d 199 (1984), our Supreme Court held that "[s]ince access to the statements of witnesses for the prosecuting authority is not a constitutional right . . . the burden of showing prejudice rests on the defendant." (Citations omitted.)

We conclude that in this case the trial court did not abuse its discretion by admitting the testimony.

The challenged testimony was given by Alan Mitchell, the father of one of the defendant's employees. Mitchell was called as a witness by the state. During his direct examination, Mitchell testified that he usually waited in his car in Augie's parking lot for his son, John, to finish work. The state asked Mitchell if he saw the defendant while waiting for his son on the evening of July 10, 1980. He responded: "[t]he night of the fire, I believe he drove in while I was waiting and he drove in with his car which was a, I believe was a, Cadillac Coupe DeVille." After asking a few additional questions, the state then asked Mitchell whether the defendant was the person he saw unloading the car. Mitchell replied that "[i]t has been so long I would have to say I think so, but I am not that well acquainted with him to say for sure." He further stated that he believed the person he saw that night was the owner of the restaurant. The state then asked Mitchell what he did when he saw this person unloading the car. The defendant objected arguing that the witness' inability positively to identify the person as the defendant made his testimony irrelevant. The state asked a further question to overcome the objection and Mitchell explained his hesitation as follows: "I feel that I did not know the gentleman that well and it's been three years and I assume it is that gentleman, but you could put four or five other people in front of me that might have the same general appearance, and I would have to say that I am pretty sure but I just don't know." The court overruled the defendant's objection finding that it went to the weight of the evidence rather than to its admissibility. The court also indicated that it was for the jury to determine whether the person Mitchell saw drive up in a Cadillac was the defendant. The defendant excepted

to the ruling. Mitchell then testified that he helped the individual unload a box from his truck in which were four plastic jugs of orange liquid.

"The rules governing the determination of relevancy are well established. '[E]vidence is relevant only when it tends to establish the existence of a material fact or to corroborate other direct evidence in the case.' *State* v. *Talton,* 197 Conn. 280, 285, 497 A.2d 35 (1985)." *State* v. *Franko,* 199 Conn. 481, 485–86, 508 A.2d 22 (1986). Here, the challenged testimony related to a material fact: the identity of the arsonist. Mitchell's testimony included a description of the man who was driving the car. He also testified that the man whom he had assisted was driving a Cadillac Coupe DeVille, the type of car the defendant owned at the time. He testified that the individual was unloading his trunk and taking the contents into the restaurant through a side entrance. From these facts, the jury could reasonably have concluded that the person Mitchell saw was the defendant. From this evidence, the jury could reasonably have inferred that the defendant was the person who started the fire. Accordingly, the evidence did "[tend] to establish the existence of a material fact." *State* v. *Talton,* supra, 285. The defendant's claim to the contrary amounts to an argument that evidence is probative only where it *proves* a material fact. This is not the law. Testimony need not prove a material fact to be relevant but need only make the existence of that fact more probable than it would have been without the testimony. *State* v. *McClendon,* 199 Conn. 5, 9, 505 A.2d 685 (1986). The trial court did not err in admitting the evidence.

The defendant's final claim is that the trial court erred by denying his motion for judgment of acquittal based on the sufficiency of the evidence. According to the defendant, the state failed to produce sufficient evidence that the setting of the fire subjected "another

person to substantial risk of bodily injury" as required under General Statutes (Rev. to 1979) § 53a-112.[6] The defendant concedes that the state presented evidence that firefighters were subjected to a substantial risk of bodily injury. He argues, however, that because General Statutes (Rev. to 1979) § 53a-111, as amended by Public Acts 1979, No. 79-570, § 3,[7] arson in the first degree, specifically mentions firefighters as a protected group and General Statutes (Rev. to 1979) § 53a-112, the second degree arson statute, does not, this court must find that the legislature intended not to authorize prosecution for arson in the second degree where only firefighters were subjected to substantial risk of bodily injury.

General Statutes (Rev. to 1979) § 53a-112 defines arson in the second degree as an intentional burning which "subjects another person to substantial risk of bodily injury." Accordingly, to accept the defendant's argument, this court would have to hold that firefighters are not "persons." "A cardinal rule of statutory construction is that where the words of a statute are plain and unambiguous the intent of the General Assembly in enacting the statute is to be derived from the words used. See *State* v. *Smith,* 194 Conn. 213, 221, 479 A.2d 814 (1984); *McDonald* v. *Haynes Medical*

[6] General Statutes (Rev. to 1979) § 53a-112 provides in part: "A person is guilty of arson in the second degree when he starts a fire or causes an explosion: (1) With intent to destroy or damage a building (A) of another, or (B) whether his own or another's to collect insurance for such loss; and (2) such act subjects another person to a substantial risk of bodily injury or another building to a substantial risk of destruction or damage."

[7] General Statutes (Rev. to 1979) § 53a-111, as amended by Public Acts 1979, No. 79-570, § 3, provides in part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied; or (2) any other person is injured, either directly or indirectly; or (3) a peace officer or firefighter is so close to such building that he is subjected to a substantial risk of bodily injury."

*Laboratory, Inc.,* 192 Conn. 327, 334, 471 A.2d 646 (1984); *P. X. Restaurant, Inc.* v. *Windsor,* 189 Conn. 153, 159, 454 A.2d 1258 (1983). A corollary rule is that the words of a statute are to be construed with common sense and 'according to the commonly approved usage of the language.' General Statutes § 1-1; *State* v. *Belton,* 190 Conn. 496, 506, 461 A.2d 973 (1983); *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983)." *State* v. *Pellegrino,* 194 Conn. 279, 284, 480 A.2d 537 (1984).

Here, the language of the statute is unusually plain and unambiguous: liability attaches where "another person" is subjected to a substantial risk of injury. The commonly approved usage of the word "person" certainly includes firefighters. Nor do we see anything in the language of §§ 53a-111 or 53a-112 or the history of those statutes which would persuade us that the legislature did not intend to include firefighters within the definition of the word persons. The trial court did not err in denying the defendant's motion for judgment of acquittal.[8]

There is no error.

In this opinion the other judges concurred.

---

[8] Our decision on this claim of error is supported by our Supreme Court's decision in *State* v. *Moye,* 199 Conn. 389, 398–99, 507 A.2d 1001 (1986).