STATE OF CONNECTICUT *v.* RICHARD POUNCEY
(12128)

Foti, Heiman and Spear, Js.

---

[6] See footnote 4.

Argued November 7, 1995—decision released March 19, 1996

*Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Carolyn K. Longstreth*, assistant state's attorney, with whom, were *Elizabeth Baran*, assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, for the appellee (state).

FOTI, J. The defendant appeals following a jury trial, from the judgment of conviction, of two counts of attempted assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1). The trial court sentenced the defendant to an effective term of imprisonment of twenty-four years, suspended after twenty years, followed by a five year probationary period. On appeal, the defendant claims that the trial court improperly (1) instructed the jury on the issue of self-defense, (2) denied his motion for a mistrial, and (3) instructed the jury on the concept of reasonable doubt. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On the evening of December 14, 1991, four women had dinner at a restaurant on York Street in New Haven. As they left the restaurant, they observed the defendant and a pregnant female engaged in a heated argument at the corner of York and Chapel Streets. As the pregnant woman walked away from the defendant, he walked quickly toward the women appearing to be extremely angry and emotionally upset. The women were apprehensive and moved closer together to give the defendant room to pass them on the sidewalk. When the defendant reached them, he asked, "What the hell is wrong with you?" "Are you looking for trouble?" or "What the fuck are you looking at?" He then collided with one of the women, punched her in the jaw and knocked her down. A second woman told the defendant, "Keep going, we don't want any trouble." The defendant then lunged at her, grabbed her by the front of her coat collar and, in a savage and wild manner, began to slash, punch and stab at her with a box cutter. The victim sustained a cut behind her left ear that was two inches long and one-quarter inch deep. Her coat was cut in four or five places.

As the first woman got up from the sidewalk, she attempted to pull the second woman away from the defendant. The defendant then slashed her face with the box cutter, cutting her upper lip and slashing her lower lip open from its lower edge down to her chin, causing her to fall back down to the sidewalk.

The defendant left when a parking lot attendant, who saw the victims bleeding, intervened. When the police arrived, they found the defendant hiding in an alley a short distance away. The police retrieved the box cutter, detained the defendant and returned him to the scene of the assault. After the victims identified the defendant as the assailant, the police arrested him and placed him in a police cruiser, at which time he stated that he had

"cut the fucking bull dikes because they were surrounding [him]. Who gives a fuck about them."

I

The defendant claims that the trial court improperly instructed the jury on self-defense, specifically as to reasonable force, provocation, withdrawal after initial aggression and the duty to retreat. He also argues that the trial court charged that the state had actually disproved self-defense, effectively directing the jury on its verdict.[1] We do not agree.

The defendant alleges that the jury was improperly instructed as to its evaluation of both the danger that the defendant claimed to have faced and the reasonableness of his response to that danger. The trial court instructed that reasonable force is "that force which an average person of ordinary intelligence in like circumstances would judge to be necessary to prevent injury and no more. Reasonable force is the amount of force that would be used by an average person of ordinary intelligence acting under the same circumstances." The defendant posits that this portion of the instruction improperly substituted an objective standard for the subjective-objective standard contained in § 53a-49 (a) (2). He argues that the charge did not properly explain to the jury its need to examine and evaluate the defendant's subjective belief as to the amount of force he felt necessary to defend himself.

---

[1] On February 1, 1995, following the defendant's appeal, the state filed a motion for rectification, claiming that the challenged portion of the transcript, which the defendant claimed amounted to a directed verdict, was incorrect. Following a hearing at which the trial court heard testimony from the court reporter, the defendant's trial counsel, and the trial prosecutor, the trial court granted, by written memorandum of decision, the motion for rectification. The transcript, as initially prepared, omitted the word "if" several times, suggesting that the state had actually disproved the defendant's argument of self-defense. The transcript, as rectified, nullifies the defendant's claim of a directed verdict.

An instruction on reasonable force is adequate if it informs the jury that it must examine and evaluate the defendant's subjective belief as to the amount of force necessary. *State* v. *Prioleau*, 235 Conn. 274, 288, 644 A.2d 743 (1995). Without an express instruction to consider the defendant's subjective beliefs concerning the reasonableness of the degree of force used, it is incorrect to define "reasonable force" as " 'that force which an average person of ordinary intelligence in like circumstances would judge to be necessary to prevent injury and no more'. . . ." *State* v. *Anderson*, 227 Conn. 518, 533, 631 A.2d 1149 (1993).

The defendant admitted at trial that he cut both women with the box cutter. He argued, however, that he did so in self-defense. He claimed that after the four women had lined up across the sidewalk in front of him, blocking his path, he told them to mind their own business, pushed through them, was hit from behind, turned and was kicked in the groin. He maintained that he thought his life was in danger and cut the victims to defend himself.

The defendant filed a request to charge on the issue of self-defense. The trial court instructed the jury that the state had the burden of disproving self-defense beyond a reasonable doubt, and that the defendant "was justified in using reasonable physical force upon [the two women] to defend himself from what he reasonably believed to be the use of physical force or the imminent use of physical force, and he was entitled to use such degree of force which he reasonably believed to be necessary for that purpose except that [he] was not permitted to use deadly physical force unless he reasonably believed that [either of the two women] or another in that group was inflicting or about to inflict great bodily harm." The court defined reasonable force and proceeded to instruct on the state's burden of disproving self-defense.

The court instructed the jury that the state would sustain its burden of refuting the self-defense claim if it proved that the defendant did not believe that he was in imminent danger of death or serious physical injury, or that he did not have reasonable grounds for that belief, or that the force used was unreasonable, or that the defendant was the initial aggressor or provocateur and did not attempt to withdraw. The instruction directed the jury to consider the danger or apparent danger to the defendant "to be determined from his standpoint at the time of the action and under all of the existing circumstances." The court further charged that "[t]he act leading to the defendant's claim of self-defense need not be an actual threat of assault. The test is not what the person actually intends but what that other person's act caused the defendant to reasonably believe was his intention or her intention." The court then stated: "In other words, the danger need not be actual. If the defendant reasonably believed that the danger was actual, real, imminent or unavoidable. In judging the danger to himself, however, the defendant is not required to act with infallible judgment." The court also instructed that apparent danger alone was insufficient to justify the use of force and that the defendant's belief of danger had to be honest and sincere.

Our standard of review on this claim is whether it is reasonably possible that the jury was misled. *State* v. *Anderson*, supra, 227 Conn. 526–27. This court will review the entire charge and will not judge an individual instruction in artificial isolation. *State* v. *Reed*, 174 Conn. 287, 305, 386 A.2d 243 (1978). We test whether the charge, read as a whole, presents the case to the jury so that no injustice will result. *State* v. *Dyson*, 217 Conn. 498, 502, 586 A.2d 610 (1991). We conclude that the trial court clearly directed the jury to evaluate the defendant's belief in the danger he claimed to have

faced from the four women, from his subjective perspective, and that it is not reasonably possible that the jury was misled. *State* v. *Prioleau,* supra, 235 Conn. 291.

Our review of the entire charge also leads us to conclude that the defendant's claims that the trial court improperly instructed on the rule concerning provocation, the principle of initial aggressor and the doctrine of communicated withdrawal, are without merit. Id., 291–95.

The defendant correctly claims that the trial court improperly instructed the jury on the duty to retreat in that it failed to instruct that the use of deadly physical force in defending oneself is impermissible *only* if the state proves beyond a reasonable doubt that a defendant knows that he can retreat with complete safety. General Statutes § 53a-19 (b).[2] While the jury was instructed that its duty was to determine whether the defendant could have retreated with complete safety, no instruction was given that the defendant was required to know that a retreat in complete safety was available. See *State* v. *Ash,* 231 Conn. 484, 651 A.2d 247 (1994).

The issue presented is whether the court's omission of the necessity of this knowledge by the defendant, when viewed in light of the charge that was given concerning the duty to retreat, the charge as a whole, the

---

[2] General Statutes § 53a-19 (b) provides: "Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform."

context of the contested facts of the case, and the theory of defense, was harmless beyond a reasonable doubt.

"[T]he question of harmlessness of a jury instruction is properly gauged by reference to both the language of the entire charge and the evidence in the case . . . ." Id., 496–97. The question of whether the defendant knew that he had a way of retreating in complete safety, was not a critical circumstance in the jury's evaluation of his claim of self-defense. The defense's theory of the case was primarily that the defendant lacked the specific intent to cause serious physical injury.[3] The issue of self-defense, as the evidence was presented, turned on whether the jury rejected that defense because the state had proven either that the defendant did not believe that any of the women were going to inflict great bodily harm on him, or that such a belief was unreasonable, or that the defendant was the initial aggressor or that he provoked the incident.

Our examination of the evidence presented, the contested issues of fact and the theory of defense leads us to conclude that there is no significant question raised as to whether the defendant's subjective knowledge that he could avoid the use of force with complete safety by retreating was a critical circumstance. *State* v. *Prioleau*, supra, 235 Conn. 274. We conclude, therefore, that the trial court's omission was harmless beyond a reasonable doubt.

## II

The defendant next claims that his right to an impartial jury and to a fair trial was violated by the prosecu-

---

[3] During closing arguments, the defense counsel stated: "Frustration, intoxication and provocation, that's what this case is all about." Counsel also stated that "provocation . . . not only goes to self-defense but it also goes to . . . intent . . . to cause serious physical injury." On appeal, the defendant argues, and we agree, that "[t]here was no real question of identity or causation, and thus the contested issues were intent and whether the state had disproved the claim of self-defense."

tor's violation of a court order and by her remarks during her closing argument. He alleges that the trial court improperly denied his motions for mistrial.

Prior to trial, the defendant filed a motion to exclude certain evidence from being presented at trial to impeach his credibility, including evidence regarding his incarceration. The motion was not ruled on, but the trial court ordered the state, prior to its introducing any such evidence, to make an offer of proof outside the jury's presence.

During cross-examination of the woman with whom the defendant had been arguing just prior to the incident, the following exchange took place.

"[Prosecutor]: Isn't it a fact that you are . . . afraid of [the defendant]?

"A: Was afraid of him, yes.

"[Prosecutor]: Isn't it true that you're afraid that if he gets out in the street again and you don't help him out that he could hurt you?

"A: Absolutely not."

The defendant, in the absence of the jury, then moved for a mistrial. The court denied the motion and gave the following curative instruction upon the jury's return: "Ladies and gentlemen, the question that was asked just before you were excused along the lines of are you afraid that if [the defendant] is not convicted and after he gets out and you didn't help him whether you would be afraid he might hurt you. In substance, that was the question. It created the implication that the defendant is now incarcerated and the fact of the matter is he is incarcerated. He is incarcerated and he is on this case because he has been unable to post the bond that is set by the court. Now, that is a situation that frequently occurs when someone is financially unable to post the

bond. When they are arrested a bond is set by the court and if the defendant is able to post the bond he is released on bond until the case comes up. If he can't post the bond he has to be held incarcerated until the case comes up. That's the situation with [the defendant]. The fact that he's incarcerated, just been unable to post the bond, is not evidence against him, is not to be held by the jury against him in any way. It has nothing to do with his guilt or innocence in this case. Now, rephrase the question please."

While we agree that the prosecutor violated the court's order and improperly referred to the defendant's incarceration, we recognize that the trial court is in the best position to determine the extent of the prejudicial effect. *State* v. *Harvey*, 27 Conn. App. 171, 178, 605 A.2d 563, cert. denied, 222 Conn. 907, 608 A.2d 693 (1992). The trial court, in its discretion, concluded that, under all of the circumstances, the improper reference to the defendant's incarceration was within the healing power of a curative instruction and did not require the drastic response of a mistrial. *State* v. *Tucker*, 226 Conn. 618, 629, 629 A.2d 1067 (1993).

The court's instruction was both curative and informative. While the court did not instruct the jury to forget the question's implication, the court did instruct the jury not to hold the defendant's incarceration against him. Moreover, the trial court's instruction informed the jury why the defendant was incarcerated and further explained that evidence of pretrial incarceration, due to an inability to post bond, has no probative value. We conclude that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial and that its denial did not deprive the defendant of a fair trial.

The defendant also claims that he was deprived of a fair trial by the prosecutor's remarks during final

argument and that the trial court, therefore, improperly denied his motion for a mistrial.

The prosecuting attorney opened her final argument as follows: "[The four women] got together for dinner on December 14, 1991, a nice relaxing dinner. They had plans to go out after dinner. They were minding their own business when they were confronted with what suburbanites would call the ultimate urban nightmare."

The defendant's counsel made no objection and the prosecutor's initial argument was completed. During his summation to the jury, the defendant's counsel characterized the challenged comment as racist. On closing argument, the prosecutor, in replying to the defendant's closing arguments regarding self-defense, commented that "[t]hese women were in the wrong place at the wrong time in an urban neighborhood." Again no objection was made by the defendant's counsel. After the luncheon recess the defendant moved for a mistrial. The court denied the motion[4] and also denied the defendant's request for a curative instruction. The court stated: "I don't think that it is of such significance that it calls for any remarks by the court. If you felt it was significant you should have interrupted at the time. Something you gave some thought to over lunch apparently."

"The focus of our review is on the prosecutor's comments viewed in the context of the entire trial, not on the culpability of the prosecutor. . . . Moreover, we will not disturb the trial court's mistrial ruling unless the challenged remarks have so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Citation omitted; internal quotation

---

[4] The defendant filed his motion for a new trial pursuant to Practice Book § 902 and renewed his objection to the prosecutor's summation remarks. That motion was denied.

marks omitted.) *State* v. *Castonguay*, 218 Conn. 486, 508, 590 A.2d 901 (1991).

The trial court not only expressly found that the prosecutor's remarks were insufficiently prejudicial to warrant a mistrial, but concluded that they were not sufficiently prejudicial to require a curative instruction. Therefore, the trial court did not consider the remarks to rise to the level of "prosecutorial misconduct." "When a verdict is challenged on the basis of the prosecutor's allegedly prejudicial remarks, the defendant bears the burden of proving the remarks prejudicial in light of the whole trial." *State* v. *Floyd*, 10 Conn. App. 361, 364, 523 A.2d 1323, cert. denied, 203 Conn. 809, 525 A.2d 523, cert. denied, 484 U.S. 859, 108 S. Ct. 172, 98 L. Ed. 2d 126 (1987). The trial court's ruling "is entitled to weight because of the vantage point from which it can observe and evaluate the circumstances of the trial. The trial court is in a better position to determine the propriety of the remarks of counsel and whether or not they are harmful." *State* v. *Glenn*, 194 Conn. 483, 493, 481 A.2d 741 (1984). Our review of the record convinces us that the defendant has not sustained his burden of proving the remarks prejudicial in light of the whole trial.[5]

Even if we assume, arguendo, that the remarks were more than inartfully phrased statements of a zealous prosecutor, and therefore improper, we must still consider them in the context of the entire trial and make a determination as to whether the fairness of the trial was compromised. *State* v. *Sherman*, 38 Conn. App.

[5] While a prosecutor may present closing argument with logical force and vigor; *State* v. *Sherman*, 38 Conn. App. 371, 401, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995); he or she may not appeal to passions and prejudices of the jury. *State* v. *Couture*, 194 Conn. 530, 564, 482 A.2d 300 (1984). We condemn any such remarks made for racial reasons, intentionally or otherwise, that may affect the verdict to the prejudice of the defendant.

371, 397, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

The prosecutor's comments were isolated, brief and confined to closing arguments. Defense counsel responded to the prosecutor's first comment. The prosecutor's comments were not the culmination of an improper theme developed throughout the trial, nor was a pattern of misconduct discernible. The defendant's argument of a cumulative prejudice, suffered as a result of the state's earlier reference to his incarceration, is without merit. Furthermore, the trial court clearly instructed the jury that the defendant was entitled to the presumption of innocence, and that the arguments of counsel during final summation were not evidence. The court also admonished the jury to "keep in mind that this defendant . . . justly relies on you to carefully consider the claims made in his behalf by his counsel . . . and to consider all of the evidence and find him not guilty if the law and the facts requires such a verdict." Furthermore, the state presented a very strong case against the defendant.

In the context of this trial, the effect of the state's improper comments, if in fact they were improper, cannot be said to have affected the outcome of the trial,

or to have so infected the trial with unfairness as to make the defendant's resulting conviction a denial of due process.

## III

The trial court instructed the jury on the concept of reasonable doubt by defining reasonable doubt as a doubt "for which a reasonable man or woman can give a valid reason," and further as a doubt "which would cause you as reasonable and prudent men and women to hesitate to act in the more weighty and important matters relating to your own affairs." The defendant asserts that these instructions were improper.

Although this claim was not preserved at trial, the defendant claims review under the *Evans-Golding*[6] doctrine, and alleges that the reasonable doubt instructions shifted or diminished the state's burden of proof, thereby presenting a constitutional claim.

The challenged instruction on "valid reason" is similar or identical to the instruction approved by our Supreme Court. *State* v. *DePastino*, 228 Conn. 552, 571–72, 638 A.2d 578 (1994); *State* v. *Gomez*, 225 Conn. 347, 353, 622 A.2d 1014 (1993); *State* v. *Adams*, 225 Conn. 270, 291, 623 A.2d 42 (1993); *State* v. *Derrico*, 181 Conn. 151, 171, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). Such an instruction did not decrease the state's burden when viewed in the context of the charge as a whole. The defendant cannot prevail on this claim.

Further, we reject the defendant's additional, unpreserved claim relating to a reasonable doubt as one "which would cause you as reasonable and prudent men and women to hesitate to act in the more weighty and important matters relating to your own affairs."

---

[6] *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989); *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973)

We conclude that the charge given by the trial court was proper.[7]

The judgment is affirmed.

In this opinion HEIMAN, J., concurred.

SPEAR, J., dissenting. I concur in parts I and III of the majority opinion as well as that portion of part II that addresses the prosecutor's violation of a court order. I respectfully dissent from that portion of part II that addresses the prosecutor's closing argument. I view the references to a "suburbanite's . . . ultimate urban nightmare" and being in the "wrong place" in an "urban neighborhood"[1] as appeals to racial passion and prejudice. Such appeals constitute misconduct and warrant a reversal.

A reference to certain evidence elicited during the defense case is important to set the context for the prosecutor's remarks. The pregnant female with whom the defendant quarreled testified that she was the defendant's fiancee. There was evidence that she gave birth to the defendant's child four days after the quarrel and that the argument arose because she had refused to stop using drugs during her pregnancy.

The defendant testified that the four women lined up in front of him as he approached them and one placed her hands on his chest in an attempt to restrain him. A parking lot attendant, who did not know the defendant, saw the incident and testified as a defense witness. He stated that the women blocked the defendant's way, grabbed him, and challenged him about the problem with his girlfriend. That witness further testified that after the defendant passed the women, they still came after him. This was consistent with the defendant's testi-

---

[7] The defendant's own request to charge included substantially identical concepts as those now challenged.

[1] The statements are set out in full in the body of the majority opinion.

mony that he was hit from behind when he pushed through the group. The defendant stated that when he turned around, he was kicked in the testicles and fell to the ground. He further testified that after the four women grabbed him, he pulled out the box cutter and began swinging because he was outnumbered and wanted to get the women off of him.

Obviously, the jury was not required to accept any of the defense testimony as true. Even if they accepted this testimony as credible, they were entitled to find that the defendant's use of the box cutter was not justified. I discuss this particular testimony, not to challenge the sufficiency of the evidence, but because it helps to explain why the prosecutor overstepped the bounds of proper conduct in attempting to portray the women as innocent victims of random urban violence. According to the prosecutor, they were "minding their own business" and were hurt simply because they were in an "urban neighborhood" at the "wrong time." She obviously wanted to do everything possible to guard against the jury's crediting the defendant's version of events, especially in view of the independent testimony that corroborated his testimony.

I do not quarrel with the majority's due process analysis. Indeed, " '[t]he fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . .' " (Citations omitted.) *State* v. *Binet*, 192 Conn. 618, 628, 473 A.2d 1200 (1984); *State* v. *Millstein*, 8 Conn. App. 581, 590, 513 A.2d 1253, cert. denied, 201 Conn. 814, 518 A.2d 72 (1986). Our Supreme Court has stated, however, that "[t]his court, nonetheless, has supervisory power to vacate a judgment of conviction and to order a new trial to deter prosecutorial misconduct which, while not so egregious as to deprive the defendant of a fair trial, is *unduly offensive* to the maintenance of a sound

judicial process." (Emphasis added; internal quotation marks omitted.) *State* v. *Fullwood*, 194 Conn. 573, 584, 484 A.2d 435 (1984).[2]

"A prosecutor may not appeal to the emotions, passions and prejudice of the jurors." *State* v. *Williams*, 204 Conn. 523, 545, 529 A.2d 653 (1987). Nor should a prosecutor "inject extraneous issues into the case that direct the jury from its duty to decide the case on the evidence." Id., 547. "While a state's attorney has an obligation to present the state's strongest case, he is not licensed to use unethical or inflammatory tactics. As an officer of the court, he has a duty to see that justice is administered in conformity with recognized principles of law." *State* v. *Dolphin*, 195 Conn. 444, 452, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985). "When reviewing allegations of prosecutorial misconduct, it must be kept in mind that [a] prosecutor is not an ordinary advocate. His duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used . . . to present matters which the jury have no right to consider." (Citations omitted; internal quotation marks omitted.) *State* v. *Falcone*, 191 Conn. 12, 22, 463 A.2d 558 (1983).

It is common knowledge that the population of the suburbs in Connecticut is overwhelmingly white, while most of the black population is concentrated in the cities.[3] This state of affairs could hardly have escaped

[2] The defendant, in his brief, requests that we exercise our supervisory authority to order a new trial because of the challenged remarks. In response, the state simply asserts that the conduct was not deliberately improper, therefore, we should not invoke our supervisory power.

[3] This case was tried in the judicial district of New Haven, which consists of the city of New Haven and twelve suburban towns. The 1990 United States census discloses that there are 57,247 black people in the district.

the prosecutor's notice. Given the starkly different racial composition of suburban and urban Connecticut, given the fact that the defendant is black while the two victims and the other prosecution witnesses are white, and given the lack of any valid reason for the challenged statements, the racial appeal is obvious.

The state argues that the comment was not racist because it merely pointed out the "well known fact that random acts of street violence occur more frequently in cities than elsewhere . . . ." Such a fact, the state asserts, is related to the evidence and the issues in the case because it supported the state's contention that the defendant lashed out at "innocent bystanders" as a way of venting his anger.

This explanation digs a deeper hole for the prosecutor. The state does not explain, and I do not understand, how general impressions about the frequency of violence in urban neighborhoods could have shed any light on the particulars of *this* case. The state asks this court to approve the proposition that the jury could have properly used its collective general knowledge about violence in the cities as evidence that the defendant committed acts of violence in this case. More importantly, the state does not even attempt to explain why the attack in this case was peculiarly a "suburbanite's . . . ultimate urban nightmare." There is certainly no logical basis for the notion that the degree of fear and trauma associated with a razor attack turns on whether the victim is a suburbanite and whether the location is urban. I can conceive of no explanation for the subur-

Of that number, 47,157, 82.4 percent, reside in the city of New Haven. The twelve suburban towns have black populations that range from 0.4 to 8.7 percent of the total population. On the other hand, the white population of ten of the twelve suburban towns in the district ranges from 93.1 to 98.6 percent. The other two towns, Hamden and Meriden, have white populations of 88.9 and 89.7 percent respectively. This type of racial distribution is seen throughout the state.

ban-urban juxtaposition of the comments other than as an improper racial appeal to the jury. Racial conflict and divisiveness in our society is of such a long-standing and intractable nature that the prosecutor's duty scrupulously to avoid appeals to racial prejudice is particularly apropos in cases such as this one. I view one such appeal as one too many because it is "unduly offensive to the maintenance of a sound judicial process." (Internal quotation marks omitted.) *State* v. *Fullwood*, supra, 194 Conn. 584.

In *State* v. *Ubaldi*, 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), the prosecutor flagrantly violated certain trial court orders and our Supreme Court reversed pursuant to its supervisory power. Although the remarks here did not violate a court order, such statements undermine confidence in our judicial system. Maintaining such confidence and preserving the integrity of our court system are as important as vindicating a trial court's orders. Remarks such as the ones at issue here only add to a perception of unfairness, and such a perception, whether accurate or not, is clearly not in keeping with the well known maxim that justice must not only be done, but must appear to be done.

I recognize that society has an important interest in the affirmance of a conviction that is supported by sufficient evidence and is free of harmful constitutional or other error. This interest must be weighed when an appellate court considers whether to reverse a conviction because of prosecutorial misconduct. See id., 572. Because there is no apparent reason why a retrial would present any unusual difficulty in this case, the scales tip clearly in favor of reversal. "Upsetting a criminal conviction is a drastic step, but it is the only feasible deterrent to flagrant prosecutorial misconduct in defiance of a trial court ruling. We are mindful of the sage admonition that appellate rebuke without reversal

ignores the reality of the adversary system of justice. The deprecatory words we use in our opinions . . . are purely ceremonial. [Prosecutors], employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice [of verbal criticism without judicial action]—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary." (Internal quotation marks omitted.) Id., 571.

In their representation of the people of the state of Connecticut, prosecutors must choose their words carefully, even in the heat of courtroom battle. They should never, because of personal or other reasons, stoop to appeals to racial prejudice. In order to express the court's strong condemnation of such tactics and to deter such conduct in the future, I would reverse the judgment pursuant to our supervisory authority and remand the case for a new trial.