STATE OF CONNECTICUT *v.* PATRICK CHASSE
(AC 17031)

Landau, Schaller and Healey, Js.

---

346

Argued September 15—officially released December 22, 1998

*Susan M. Hankins,* assistant public defender, with whom were *Paulette Annon,* certified legal intern, and, on the brief, *Stacey McGrath,* certified legal intern, for the appellant (defendant).

*Mitchell S. Brody,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *James Dinnan,* assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Patrick Chasse, appeals from the judgment of conviction, rendered after a jury trial, of arson in the first degree in violation of General Statutes § 53a-111 (a) (1), arson in the second degree in violation of General Statutes § 53a-112 (a) (1) and attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1). On appeal, the defendant claims that the trial court improperly (1) permitted the prosecutor to engage in misconduct, (2) instructed the jury concerning the element of intent and (3) instructed the jury on the effect of his intoxication evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In May, 1994, Eric Freeman was working as an attendant at a gas station in Guilford. While on duty at the gas station, Freeman was threatened in a telephone call from the defendant who claimed that he had been told by a mutual friend, Matt Broder, that Freeman intended to damage Broder's car. Later the same day, the defendant came to the gas station and threatened Freeman with physical harm. Freeman then called the police. As a result of the incident, Freeman was fired by the station owner. Approximately one and one-half months after the incident, Freeman resumed work at the gas station when ownership changed hands.

On September 5, 1994, at approximately 10 p.m., Freeman was preparing to close the gas station for the night. As Freeman was doing paperwork in the office, he noticed the defendant walk up to the front window, pause and then walk off to the side of the building. A minute later, Freeman observed the defendant run up to the office door with something burning in his hand. The defendant then knelt down, opened the door and threw a burning bottle into the office. The burning bottle struck a soda machine and hit the floor without breaking. The contents of the bottle, however, began to leak out onto the office carpet. After several attempts, Freeman kicked the burning bottle outside. With the office carpet ablaze, Freeman attempted to put out the fire with the station's fire extinguisher, but the extinguisher did not work. An unidentified passerby then drove into the station and put out the fires, both inside and outside of the office, with his own fire extinguisher.

Shortly after the unidentified passerby departed, two of Freeman's friends arrived at the station when they drove by and observed smoke coming from the service area. Freeman told his two friends of the events that had recently transpired. The two friends assisted Freeman in ventilating the service station and then they called the police.

Upon arrival at the scene, the police observed burn marks on the office carpet and discharge from a fire extinguisher both inside and outside of the station. The police seized the bottle containing a liquid and a paper wick. Subsequent tests by the state police forensic laboratory found the liquid in the bottle to be consistent with gasoline.

The state charged the defendant with arson in the first degree in violation of General Statutes § 53a-111 (a) (1),[1] arson in the second degree in violation of General

---

[1] General Statutes § 53a-111 provides in relevant part: "(a) A person is guilty of arson in the first degree when, with intent to destroy or damage

Statutes § 53a-112 (a) (1),[2] arson in the third degree in violation of General Statutes § 53a-113 (a),[3] attempt to commit first degree assault in violation of General Statutes §§ 53a-49 (a) (2)[4] and 53a-59 (a) (1)[5] and fabricating an explosive device in violation of General Statutes § 53-80a.[6] At trial, the defendant alleged that he had been at home passed out on his couch when the firebombing occurred. To support his alibi, the defendant presented testimony from several witnesses who were either related to him or friends of his. In essence, the witnesses testified that on September 5, 1994, they attended a

a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

[2] General Statutes § 53a-112 provides in relevant part: "(a) A person is guilty of arson in the second degree when, with intent to destroy or damage a building, as defined in section 53a-100, (1) he starts a fire or causes an explosion and (A) such act subjects another person to a substantial risk of bodily injury; or (B) such fire or explosion was intended to conceal some other criminal act; or (C) such fire or explosion was intended to subject another person to a deprivation of a right, privilege or immunity secured or protected by the constitution or laws of this state or of the United States . . . ."

[3] General Statutes § 53a-113 (a) provides: "A person is guilty of arson in the third degree when he recklessly causes destruction or damage to a building, as defined in section 53a-100, of his own or of another by intentionally starting a fire or causing an explosion."

[4] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

[5] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[6] General Statutes § 53-80a provides: "Any person, other than one engaged in the manufacture of firearms or explosives or incendiary devices for lawful purposes, who fabricates, in any manner, any type of an explosive, incendiary or other device designed to be dropped, hurled, or set in place to be exploded by a timing device, shall be guilty of a class B felony."

Labor Day party at the defendant's home. The party started outdoors at 3 p.m. and moved indoors at approximately 9 p.m. The witnesses testified that the defendant, who had been drinking heavily, subsequently passed out on the couch and was observed there at about 10 p.m. The defendant's wife recalled that the defendant was asleep at 10 p.m. because she had just finished putting their children to bed, which she always began at 9 p.m. None of the witnesses, however, told these circumstances to police.

On September 20, 1996, a jury found the defendant guilty of the crimes of arson in the first degree, arson in the second degree and attempt to commit first degree assault. The jury also found the defendant not guilty of the crimes of arson in the third degree and fabricating an explosive device. Thereafter, the trial court denied the defendant's motion for a new trial. This appeal followed. Additional facts will be set forth as they become relevant in the context of the defendant's specific claims.

I

The defendant first claims that the trial court improperly permitted the prosecutor to engage in misconduct during closing argument. Specifically, the defendant claims that the prosecutor, during rebuttal closing argument, violated his due process right to a fair trial by (1) making a misstatement known to be untrue concerning the extent of the defense's evidence impeaching Freeman's credibility, (2) disparaging the evidence of the defense and impugning the institutional role of the defense counsel and his investigator, (3) testifying as an unsworn witness to facts not in evidence and (4) seeking the jurors' personal identification with Freeman, vouching for the credibility of witnesses and stating his personal opinions and beliefs. We are not persuaded.

In his closing argument, the prosecutor correctly indicated to the jury that the state's case rested on the testimony of Freeman, the only eyewitness to the incident, and that "if you don't believe Eric Freeman's testimony that the defendant was the person who threw the firebomb, then the defendant's not guilty. Clear and simple." Defense counsel, also cognizant of the importance of Freeman's testimony, properly devoted most of her closing argument to Freeman and his testimony. Specifically, defense counsel questioned the credibility of Freeman's account of the incident. The jury was urged by defense counsel to question Freeman's recollection of the events because of inconsistent statements he gave to police. Defense counsel questioned the credibility of Freeman's further testimony concerning the unidentified passerby's coming to his aid, stating that if Freeman was lying about the unidentified passerby, then "[Freeman is] lying to you about a lot of things." Defense counsel also focused on the impeachment evidence[7] she had elicited from Freeman[8] and stated that Freeman's demeanor on the witness stand did not strike her as being as credible as that of the defense witnesses.

In his rebuttal argument, the prosecutor attempted to respond to defense counsel's foray on Freeman and

[7] During cross-examination, the defense counsel attempted to impeach Freeman's credibility by eliciting Freeman's admission that he had lied to the police. On redirect examination, Freeman admitted that he had been buying alcohol for his underage friend Broder and, before telling the police the truth, had informed the police that he was purchasing the alcohol for himself and another person.

[8] In her closing argument, defense counsel stated: "This is a man who lied to the police in December of 1995 when [Freeman] had his own troubles to deal with. When [Freeman] talked about that on the stand he didn't seem troubled about the fact that he lied to the police. I said, 'Did you lie to the police in December of [1995]?' He said, 'Yeah.' Was he upset, remorseful, bothered? No. To me, that's my interpretation of his demeanor and his response to that question. It's important because he lied to the police in December of [1995], could he have lied to the police in September of 1994? Could he lie to a jury in September of 1996 with that same nonchalant attitude? I think you can find that."

his testimony. In so doing, the prosecutor made a number of remarks that the defendant claims were improper. We will address each of the claimed instances of misconduct in turn.

## A

The defendant first argues that the prosecutor made a misstatement known to be untrue concerning the extent of the defense's evidence impeaching Freeman's credibility. During his rebuttal argument, the prosecutor, knowing that the defendant had other evidence of misconduct that defense counsel did not offer because she believed there was no legal basis on which to offer such evidence, argued to the jury that the admitted misconduct; see footnote 7; was the only "dirt" the defendant could "come up with." At the close of the prosecutor's rebuttal, the defendant moved the trial court to give the jury a cautionary instruction, which the trial court denied. The defendant subsequently renewed his objection in a motion for a new trial, which the trial court also denied. The defendant claims that these remarks misled the jury and bolstered Freeman's testimony by implying that defense counsel had no other evidence of misconduct that she could use to impeach Freeman.

We will review this claim because it was raised at trial and adequately preserved for review. Prosecutorial misconduct may occur during closing argument. See *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996); *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987). "The focus of our review is on the prosecutor's comments viewed in the context of the entire trial, not on the culpability of the prosecutor. . . . Moreover, we will not disturb the trial court's . . . ruling unless the challenged remarks have so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Citation omitted; internal

quotation marks omitted.) *State* v. *Castonguay*, 218 Conn. 486, 508, 590 A.2d 901 (1991).

At the outset, we note that the trial court did not interpret the prosecutor's remarks in the same manner as did the defendant.[9] The trial court not only found that the prosecutor's comments were not sufficiently misleading to warrant a new trial, but also concluded that they were insufficiently misleading to require a curative instruction.

"When a verdict is challenged on the basis of the prosecutor's allegedly prejudicial remarks, the defendant bears the burden of proving the remarks prejudicial in light of the whole trial. . . . The trial court's ruling is entitled to weight because of the vantage point from which it can observe and evaluate the circumstances of the trial. The trial court is in a better position to determine the propriety of the remarks of counsel and whether or not they are harmful." (Citation omitted; internal quotation marks omitted.) *State* v. *Pouncey*, 40 Conn. App. 624, 635, 673 A.2d 547 (1996), aff'd, 241 Conn. 802, 699 A.2d 901 (1997). Therefore, the trial court's determination that the prosecutor's remarks did not require a new trial must be afforded great weight. *State* v. *Ruscoe*, 212 Conn. 223, 249, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990); *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

---

[9] In denying the defendant's motion for a new trial, the trial court stated: "I construed the remark to be when [the prosecutor] referred to only one piece of dirt, which [the jury] heard about which was admissible in this case. I didn't construe that remark to mean that [Freeman] does not have any blemish in his history other than this, I didn't construe it and I don't believe the jury construed it that way. [The jury] heard about one . . . matter that was offered to impeach [Freeman's] credibility, I assume that's the dirt [the prosecutor] was referring to, that there may have been other things in [Freeman's] background not admissible in this case or at least not claimed in this case. I don't think that it would be construed in any other way."

Immediately prior to making the disputed remarks, the prosecutor referred to Freeman's 1995 lie to the police, the only evidence offered by the defendant to impeach Freeman's credibility. When viewed in this context, the trial court properly ruled that the jury would reasonably have construed the remarks to refer to the only piece of admissible "dirt," the 1995 lie to the police, offered to impeach Freeman's credibility and not that Freeman did not have any other blemishes in his history. Under these circumstances, we find it appropriate to defer to the trial court's determination and conclude that the defendant has not sustained his burden of proving the remarks prejudicial in light of the whole trial.[10]

## B

Before we address the defendant's remaining prosecutorial misconduct arguments, we note that the defendant failed to raise them at trial and now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[11]

---

[10] The defendant argues that *State* v. *Carter*, 228 Conn. 412, 636 A.2d 821 (1994), is controlling. In *Carter*, however, our Supreme Court held that the trial court had improperly declined to admit into evidence the victim's criminal record, and, because the prosecutor had taken advantage of the error in his closing argument by asserting that there was no evidence of the victim's violent character, that error was not harmless beyond a reasonable doubt. Id., 425–29. Here, the defendant did not seek to admit, and the trial court did not rule on, the admissibility of the other claimed instances of misconduct.

[11] " 'In *State* v. *Golding*, [supra, 213 Conn. 239–40], we reformulated the standard announced in *State* v. *Evans*, [165 Conn. 61, 327 A.2d 576 (1973)] for appellate consideration of constitutional claims that were not preserved at trial. We stated that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." . . . *State* v. *Golding*, supra [239–40].

"[T]o deprive a defendant of his constitutional right to a fair trial . . . the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . [M]oreover . . . [*Golding*] review of such a claim is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial . . . . *State* v. *Atkinson*, [supra, 235 Conn. 769]." (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 356–57, 696 A.2d 944 (1997).

"In determining whether this claim of prosecutorial misconduct deprived the defendant of his due process right to a fair trial, we must first decide whether the prosecutor's remarks were, in fact, improper, and, if so, whether they substantially prejudiced the defendant." *State* v. *Provost*, 49 Conn. App. 56, 64–65, 713 A.2d 879, cert. granted on other grounds, 247 Conn. 914, 722 A.2d 808 (1998); see also *State* v. *Oehman*, 212 Conn. 325, 336, 562 A.2d 493 (1989). In doing so, we have focused on several factors, "[i]ncluded among those factors are the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Falcone*, 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) [cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982)]; the frequency of the misconduct; *State* v. *Couture*, 194 Conn. 530, 562–63,

We noted that we would remain free to dispose of the claim "by focusing on whichever condition is most relevant in the particular circumstances." Id., 240.' *State* v. *Watlington*, 216 Conn. 188, 192, 579 A.2d 490 (1990)." (Emphasis in original.) *State* v. *Atkinson*, supra, 235 Conn. 768 n.26.

482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); see *State* v. *Doehrer,* [200 Conn. 642, 654, 513 A.2d 58 (1986)]; *State* v. *Palmer,* [196 Conn. 157, 164, 491 A.2d 1075 (1985)]; the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States,* 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica,* supra, 1181; *Harris* v. *United States,* 402 F.2d 656, 657 n.1 (D.C. Cir. 1968); *State* v. *Doehrer,* supra, 654; and the strength of the state's case. See *United States* v. *Modica,* supra, 1181; *State* v. *Couture,* supra, 564; see also *State* v. *Glenn,* 194 Conn. 483, 492, 481 A.2d 741 (1984)." (Internal quotation marks omitted.) *State* v. *Alexander,* 50 Conn. App. 242, 255–56, 718 A.2d 66 (1998), cert. granted on other grounds, 247 Conn. 927, 719 A.2d 1169 (1998).

We do not scrutinize each individual comment in a vacuum, but rather "we must review the comments complained of in the context of the entire trial." *State* v. *Robinson,* 227 Conn. 711, 746, 631 A.2d 288 (1993). It is in that context that "the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." Id. The defendant has failed to meet his burden.

Again, it is important to note that the defendant made no objections and failed to ask for any curative instruction with regard to the remaining prosecutorial misconduct claims. "The defendant, therefore, presumably did not regard those remarks . . . as seriously prejudicial at trial." *State* v. *Cox,* 50 Conn. App. 175, 180, 718 A.2d 60, cert. granted on other grounds, 247 Conn. 928, 719 A.2d 1170 (1998); see also *State* v. *Correa,* supra, 241 Conn. 358; *State* v. *Robinson,* supra, 227 Conn. 746; *State* v. *Negron,* 221 Conn. 315, 330, 603 A.2d 1138 (1992).

We now turn to the defendant's argument that the prosecutor disparaged the evidence of the defense and

impugned the institutional role of the defense counsel and her investigator. During her closing argument, defense counsel attempted to impeach Freeman's credibility by focusing on Freeman's 1995 lie to the police. In essence, defense counsel argued that the defendant should not be convicted on the basis of testimony of an individual who had acknowledged lying to the police and had testified nonchalantly about such a lie.

In his rebuttal argument, the prosecutor attempted to rehabilitate Freeman's credibility and point out the weakness in the defendant's impeachment theory. The prosecutor explained that it was the job of the defense to talk to witnesses and to "hunt" for something in Freeman's background "that [the defense] could point out to you is a reason not to believe what [Freeman] says." The prosecutor recalled for the jurors that they had heard the defense counsel properly attacking Freeman point by point while he was on the witness stand. The prosecutor argued that because the state's case came down to only one witness, Freeman, the defense had to attack Freeman's credibility. The prosecutor explained that in order to impeach Freeman's credibility the defense had to "hunt" for "dirt" on Freeman. The prosecutor then went on to characterize the defense's strategy as a "shotgun defense."[12] The defendant argues that those remarks disparaged the defendant's impeachment evidence of the state's key witness and impugned the tactics of defense counsel and the defense investigator for impeaching Freeman with that evidence.

"While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Consequently, the state must avoid arguments which are calculated to influence the

---

[12] Thereafter, the prosecutor reviewed the evidence presented by the defendant and characterized each evidentiary category as "pellets" the defendant hoped would stick.

passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . Such [a]n appeal to emotions may arise directly, or indirectly from the use of personal and degrading epithets to describe the defendant . . . and a defendant's right to a fair trial may be abridged by the repeated or flagrant use of such invective." (Citations omitted; internal quotation marks omitted.) *State* v. *Bova,* 240 Conn. 210, 243–44, 690 A.2d 1370 (1997). Furthermore, "[t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." *United States* v. *Bennett,* 75 F.3d 40, 46 (1st Cir.), cert. denied sub nom. *Lussier* v. *United States,* 519 U.S. 845, 117 S. Ct. 130, 136 L. Ed. 2d 79 (1996).

Closing arguments of counsel, however, "are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Emphasis in original; internal quotation marks omitted.) *State* v. *Glenn,* supra, 194 Conn. 495. Therefore, because closing arguments often have a rough and tumble quality about them, "some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [W]e must review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Abdalaziz,* 45 Conn.

App. 591, 605, 696 A.2d 1310, cert. granted on other grounds, 243 Conn. 902, 701 A.2d 334 (1997).

When viewed in the context of the entire summation, the jury would reasonably have understood the terms "hunt," "attack" and "dirt" as dramatic shorthand for the defense investigator's uncovering evidence impeaching Freeman's credibility and defense counsel's employing such impeachment evidence at trial. See *State* v. *Millstein*, 8 Conn. App. 581, 590, 513 A.2d 1253, cert. denied, 201 Conn. 814, 518 A.2d 72 (1986). Likewise, the jury would have understood the prosecutor's reference to the "shotgun defense" as a dramatic and colorful way of saying that the categories of evidence presented by the defendant were not persuasive and failed to undermine the state's proof of guilt beyond a reasonable doubt.

While the prosecutor might have chosen more suitable words, we cannot say that these remarks, when viewed in context, rose to the level of blatantly egregious misconduct that would implicate the defendant's constitutional right to due process. Accordingly, we conclude that this unpreserved claim is without merit.

C

The defendant next claims that the prosecutor testified as an unsworn witness to facts not in evidence. Specifically, the defendant argues that the prosecutor directed the jury outside of the record by becoming an unsworn witness and improperly expressing his own views on disputed evidentiary matters.

"A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. *State* v. *Binet*, 192 Conn. 618, 631, 473 A.2d 1200 (1984) . . . . Statements as to facts which have not been proven amount to unsworn testimony that is not the subject of proper closing argument." (Citation omitted.) *State* v. *Wil-*

*liams*, supra, 204 Conn. 544. It does not follow from this, however, that every remark not confined to the record is improper. "If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation." (Internal quotation marks omitted.) *State* v. *Laudano*, 74 Conn. 638, 646, 51 A. 860 (1902).

We again note that "[i]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument . . . and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Abdalaziz*, supra, 45 Conn. App. 605. Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence presented at trial. See *State* v. *Moore*, 49 Conn. App. 13, 28, 713 A.2d 859 (1998).

The defendant first points to the prosecutor's statement that the fire extinguisher that Freeman tried to use did not work.[13] Given the overall context of the remarks, however, the jury would reasonably have understood the prosecutor to be seeking the jury's conclusion that the extinguisher did not work properly based on Freeman's testimony and the exhibits admitted into evidence, and not by improperly injecting his own views into the record.[14]

---

[13] In rebuttal argument, the prosecutor argued: "The fire extinguisher doesn't work. You see the fire extinguisher in the photographs propping the door open. Mr. Freeman testified that doesn't work. I don't know exactly if he said the pin didn't work or how he said it didn't work, but that fire extinguisher did not work."

[14] The defendant also discerns impermissible testimony in the prosecutor's remark during rebuttal argument that "[s]omebody that knew the defendant came and helped." Given the overall context of the remarks, however, the jury would have likewise reasonably understood the prosecutor to be seeking the jury's conclusion that the person who came to help knew the defendant based on Freeman's testimony and not improperly injecting his own views into the record.

The defendant next points to the prosecutor's statements that referred to the bedtime of his own children during holiday parties.[15] In deciding cases, however, "[j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion." *State v. Crump*, 43 Conn. App. 252, 256, 683 A.2d 402, cert. denied, 239 Conn. 941, 684 A.2d 712 (1996). Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks. See *United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir.), cert. denied, 519 U.S. 1045, 117 S. Ct. 619, 136 L. Ed. 2d 543 (1996) (prosecutor's appeal to jurors to draw inferences based on common sense did not inject personal belief into argument). We also note that the prosecutor's remarks were invited by defense counsel's closing argument.[16] The prosecutor, in response to the defendant's closing remarks, properly sought to have the jurors apply their common knowledge and experience as to children's holiday bedtimes. Given the overall context of the remarks, the jurors would reasonably have viewed the prosecutor's comments as an appeal to their common sense and not an improper injection of his own views into the record.[17]

---

[15] The prosecutor made the following statements in his rebuttal argument: "I have children too and whether you people have children or not, I don't know, but I have children and I remember when my children were the age of the children of the defendant . . . I also remember children at a party when it's a holiday. Do they go to bed? If nine o'clock, as you've heard testimony . . . is the children's bedtime, that's why they remember they put the children to bed. . . . Not because of the clock, but because that's when the kids normally go to bed. Do your kids normally go to bed at their normal bedtime hour when it's a party or a holiday? Ask yourselves that, ladies and gentlemen. . . . Are they lying about that? No, they're just going on an assumption that's the normal bedtime for the kids."

[16] In her closing remarks, defense counsel stated: "But we have kids, he has kids, all of us who have kids know what time our kids go to bed. We don't have to look at the watch and say, well, it's nine o'clock. We kind of know that when bedtime comes around that it's time to put the kids to bed."

[17] The defendant also espies impermissible testimony in the prosecutor's remark during rebuttal argument that the reason this case involves only a

The defendant next argues that the prosecutor offered his own opinion and belief about Freeman's mental processes when, in explaining Freeman's failure to obtain the identity of the passerby who extinguished the fire, he characterized Freeman as a "regular guy" who would not have thought of taking a pen and pad to write down the passerby's name. Contemporaneous with the prosecutor's characterization, however, the prosecutor referenced Freeman's age, job history and the problems Freeman had experienced in answering questions during his testimony. Given the overall context, the prosecutor's remarks were permissible inferences based on the evidence and not an improper injection of his own views into the record. See *State* v. *Moore*, supra, 49 Conn. App. 28.

The defendant further argues that the prosecutor gave expert testimony concerning why fingerprinting the doorknob at the gas station would fail. In response to defense counsel's argument concerning the failure of the police to fingerprint the doorknob at the gas station, the prosecutor stated during rebuttal argument that, in his twenty years of experience, fingerprints are rarely obtained from doorknobs due to the overlapping prints of numerous hands.[18]

The state acknowledges that such remarks are clearly improper. See *State* v. *Williams*, supra, 204 Conn. 541–

single eyewitness is that "normally" arson is not committed in the full view of witnesses. The jurors would likewise have reasonably viewed the prosecutor's comments as an appeal to their common sense and not an improper injection of his own views into the record.

[18] Specifically, the prosecutor stated: "Let's start with the fingerprints. . . . [T]he [police] should have dusted the doorknob and they didn't. Mr. Supple [the expert fingerprint witness] testified that metal surfaces, plastic surfaces and glass surfaces in general are best, better than wood surfaces . . . to get fingerprints. . . . Well then a doorknob would be great. It's a metal doorknob. *I've been doing this for* [*twenty*] *years and we rarely get latent prints off of doorknobs*, lots of hands, lots of oils, smudges, overlapped prints." (Emphasis added.)

44. The remarks made by the prosecutor, however, merely paraphrased the undisputed expert testimony of Michael Supple[19] and would not have appreciably bolstered such testimony. Furthermore, both counsel argued and the trial court instructed the jury that the arguments and statements of counsel during summation were not evidence and that it was the jurors' recollection of the evidence that should have weight in their deliberations, rather than counsel's statements in final argument. When viewed in this context, the remarks were not so prejudicial that the defendant was deprived of the opportunity for a fair trial or that the entire proceedings were tainted. See *State* v. *Hammond*, 221 Conn. 264, 289, 604 A.2d 793 (1992). The prosecutor's remarks were also brief, confined to rebuttal argument and not part of a pattern of misconduct. Our careful review of the record reveals that the prosecutor's challenged conduct, while improper, was neither intentional nor flagrant and did not rise to the level of blatantly egregious misconduct that would implicate the defendant's constitutional right to due process.

## D

The defendant claims that the prosecutor, during rebuttal closing argument, violated his due process right to a fair trial by seeking the jurors' personal identification with Freeman, vouching for the credibility of witnesses and stating his personal opinions and beliefs. We disagree.

### 1

The defendant argues that the prosecutor improperly inflamed the passions and prejudices of the jurors and

---

[19] Supple testified in relevant part as follows: "Well, the surface itself is good, but being a doorknob, everybody grabbing it and opening and closing it . . . you're going to have a buildup of the oils from your hand and if you get a latent fingerprint, and I've been doing fingerprinting for over [twenty] years, what you'll have is superimposed, one over the other."

diverted them from the evidence by eliciting their personal identification with Freeman. Specifically, the defendant claims that the prosecutor's use of a certain analogy[20] during rebuttal closing argument was a calculated attempt to exhort the jurors' personal identification with Freeman by diverting their attention away from the actual evidence in the case and inciting the jurors against defense counsel on a personal level.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors." *State* v. *Williams*, supra, 204 Conn. 545. Consequently, the state must avoid arguments that are calculated to influence the passions or prejudices of the jurors because they have the effect of diverting the jurors' attention from their duty to decide the case on the evidence. *State* v. *Bova*, supra, 240 Conn. 243–44. We again emphasize, however, that a trial court should not lightly infer that a jury, upon hearing alleged improper remarks, drew from them the most damaging meaning, particularly when less damaging interpretations are more readily apparent. *State* v. *Glenn*, supra, 194 Conn. 495.

Our review of the record reveals that the alleged misconduct did not rise to the level of substantial preju-

---

[20] In his continued effort to rehabilitate Freeman's credibility and to point out the weaknesses in the defendant's impeachment theory, the prosecutor analogized Freeman's 1995 lie to lying when stopped by the police for speeding. He explained: "Ladies and gentlemen, people are often stopped for speeding. Officer stops a car and walks up and asks you . . . how fast you were going . . . ? 'Gee, officer, I didn't realize I was speeding.' In fact, you knew you were speeding. You lied to a [police officer], ladies and gentlemen. Therefore, don't ever get on that stand there because someone's going to dig that up and they're going to hunt your whole background. You're good people, you've worked all your life and that's the one thing that they could find in your background. Therefore, you're a no good liar to the police. Don't believe him. That's all. That is the dirt on Mr. Freeman.

"How many people tell a police officer, 'I didn't think I was speeding, officer?' And [the defendant] want[s] you to make the intellectual leap now that [Freeman] lied in December of [1995] to a police officer because he said . . . 'I was buying beer for an adult instead of someone under 21.'"

dice. What precipitated the prosecutor's use of the analogy was defense counsel's use of the 1995 lie in her closing argument to argue that the defendant should not be convicted on the basis of testimony of an individual who had acknowledged lying to the police. The prosecutor was, in essence, arguing that the 1995 lie to the police was not so great a crime, in the sense of degree, that it could serve as a reliable indicator of whether Freeman's testimony should be believed or disbelieved. When viewed in the context of the entire summation, the analogy would not have inflamed the passions and prejudices of the jurors and diverted them from the evidence, but rather the jurors would reasonably have viewed the analogy as an appeal to their common sense not to discredit Freeman's trial testimony because of this specific act of untruthfulness. See *United States* v. *Eltayib*, supra, 88 F.3d 173. Therefore, we conclude that the prosecutor's use of the analogy, when viewed in its context, did not rise to the level of blatantly egregious misconduct that would implicate the defendant's constitutional right to due process.

2

The defendant next complains that the prosecutor improperly injected his personal beliefs and vouched for the credibility of witnesses. Specifically, the defendant claims that certain prosecutorial remarks,[21] made during rebuttal closing argument, influenced the jury's determination of factual issues, bolstered Freeman's

---

[21] The alleged improper remarks are as follows: "Ladies and gentlemen, this is not a grand scheme that [Freeman] concocted."

"Ladies and gentlemen, that's not what happened. That's not what the evidence is."

"It makes sense to me. Does it make sense to you, though?"

"The person knelt down. But the person is [the defendant], there's no doubt about that, and then the bomb is thrown in."

"Ladies and gentlemen, you've heard [the alibi] witnesses, they cannot all be relied upon, they did not know what was going on, some by their own admission, some by just listening to their testimony."

testimony, filled in the gaps of the prosecutor's case and discredited the defendant's alibi witnesses.

It is well settled that a "prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Nor may he express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 541–44.

It does not follow from this, however, that every use of rhetorical language or device is improper. We emphasize that "[i]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument . . . and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Abdalaziz*, supra, 45 Conn. App. 605. The occasional use of rhetorical devices is simply fair argument. *United States* v. *Nersesian*, 824 F.2d 1294, 1328 (2d Cir.), cert. denied, 484 U.S. 958, 108 S. Ct. 357, 98 L. Ed. 2d 382 (1987). If every rhetorical remark made by counsel were ground for a reversal, we again stress that "comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation." (Internal quotation marks omitted.) *State* v. *Laudano*, supra, 74 Conn. 646. For an illustration of how natural it is to use such rhetorical devices, we need look only to defense counsel's closing

argument.[22] By allowing counsel generous latitude in their argument, we do not mean to trivialize their obligation to "find careful ways of inviting jurors to consider drawing argued inferences and conclusions and yet to avoid giving the impression that they are conveying their personal views to the jurors." *United States* v. *Nersesian,* supra, 1328.

Our review of the record leads us to conclude that the alleged misconduct did not rise to the level of substantial prejudice. The prosecutor's remarks were brief, confined to rebuttal argument and not part of a pattern of misconduct. Furthermore, as we have noted, the trial court instructed the jury that the arguments and statements of counsel during summation were not evidence and that it was the jurors' recollection of the evidence that should have weight in their deliberations, rather than counsel's statements in final argument. While the prosecutor might have chosen more suitable language to invite the jurors to consider drawing inferences and conclusions, we cannot say that these remarks, when viewed in their context, rose to the level of blatantly egregious misconduct that would implicate the defendant's constitutional right to due process.

## II

The defendant next claims that the trial court improperly instructed the jury concerning the element of intent.

[22] Examples of defense counsel's argument in this regard are: "Could [Freeman] lie to a jury . . . with that same nonchalant attitude? I think you can find that."

"Does it seem like [all the alibi witnesses] got together . . . and they're coordinating their testimonies? No, that's not what happened."

"It doesn't make sense to me. Or did it all happen the way [Freeman] says it happened . . . ."

"I submit that . . . [Freeman] couldn't see that person. [Freeman] couldn't see who that person was."

"I don't think you can just ignore [the alibi witnesses'] testimony . . . ."

"[Freeman's] demeanor didn't strike me as credible as a lot of the alibi witnesses . . . ."

Specifically, the defendant claims that the trial court's instruction to the jury that "[a] person acts intentionally with respect to a result or to conduct described by the statute defining an offense when his conscious objective is to cause such result or to engage in such conduct" permitted the jury to find the defendant guilty of first and second degree arson and attempted first degree assault on the basis of the intent to engage in such conduct rather than the intent to cause the specific result.[23] The state argues that, viewing the trial court's

[23] The trial court instructed the jurors in relevant part: "The second element the state has to prove [for arson in the first degree] is that the defendant specifically intended to damage a building. I'll now explain what is meant by intending or intentionally or intent. *This explanation will apply as I go through the other charges where specific intent is required, and that would be arson two, the arson three and the attempted assault first degree, the fifth count.* Those all have specific intent in them. This explanation applies to those charges as well.

"All right. *The statute and the law provide that a person acts intentionally with respect to a result or to conduct described by the statute defining an offense when his conscious objective is to cause such result or to engage in such conduct.* Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent.

"Now, intent is a mental process. A person may take the stand and testify as to what his or her intention was and you may believe that testimony or not, whether you choose to believe such testimony is for you to decide, but intention often can only be proven by the actions and the statements of the person whose act is being examined. No one can be expected to come into court and testify that he looked into another person's mind or into their eyes and saw in there a certain intention. It is often impossible, and never necessary, to prove criminal intent by direct evidence. Intent may be proven by circumstantial evidence, as I explained that term to you. Therefore, one way in which a jury can determine what a person's intention was at any given time, aside from that person's own statements, is first by determining what the person's conduct was, including any statements he made and what the circumstances were surrounding that conduct, and then from that conduct and those circumstances inferring what his intention was. In other words, a person's intention may be inferred from his conduct. *You may infer from the fact that someone engages in certain conduct that they intended to engage in that certain conduct.* Now, this inference is not a necessary one. That is, you're not required to infer intent from the accused's conduct, but it is an inference that you may draw if you find it is a reasonable and logical inference. Intent does not require premeditation, deliberation, or malice." (Emphasis added.)

instruction as a whole, the jury could not reasonably have been misled. We agree.

Although the defendant did not file a request to charge and did not take an exception to the charge as given, he now seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40; see footnote 11; or, alternatively, under the plain error doctrine. We will review the defendant's claim because "[a]n improper instruction on an element of an offense . . . is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 235, 710 A.2d 732 (1998).

"It is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) Id., 235.

We first note that the specific intent to damage or destroy a building is an essential element of the crimes of first and second degree arson; see General Statutes §§ 53a-111 (a) and 53a-112 (a); and specific intent to cause serious physical injury is an essential element of the crime of attempted first degree assault. See General Statutes § 53a-59. To act intentionally, the defendant must have the conscious objective to cause the specific result. *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995). The trial court, in defining intent, read the entire statutory definition of General Statutes § 53a-3 (11),[24] which contains references both to intent to cause

---

[24] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

a result *and* intent to engage in the proscribed conduct. Although "[i]t is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion of the statute"; *State* v. *Chapman*, 229 Conn. 529, 537, 643 A.2d 1213 (1994); that does not end our inquiry. "We next must determine whether it is reasonably possible that the jury was misled by the trial court's instructions." (Internal quotation marks omitted.) *State* v. *Austin*, supra, 244 Conn. 235–36.

The defendant argues that the trial court in this case, unlike the trial court in *Prioleau*, repeated the erroneous instruction more than once and focused the jury's attention on the inapplicable portion of the definition of intent. The defendant contends that this further "aggravated the mixture of correct and irrelevant intent instructions" and, therefore, it was possible that the instructions permitted the jury to find that the state's burden of proof was satisfied by proof of intent to engage in conduct, rather than intent to cause a specific result. Although we agree with the defendant that the portion of the instruction regarding the intent to engage in proscribed conduct was irrelevant to the crimes of first and second degree arson and attempted first degree assault, we reject his claim that the instruction warrants reversal of his conviction.

Our careful review of the entire charge persuades us that, as in *Prioleau*, any possible risk of jury confusion over the element of intent was eliminated by the trial court's numerous proper instructions on the elements of arson in the first and second degree and attempted assault in the first degree. Specifically, the trial court, prior to the disputed instruction, commenced its charge on arson by reading the information on first degree arson, alleging, inter alia, "the intent to destroy or damage a building." The trial court next read the statutory definition of arson in the first degree, which covered

the "intent to destroy or damage a building." The trial court then reviewed the state's duty to prove beyond a reasonable doubt "that the defendant intended to damage a building." The trial court again read the requirement that the state must prove "that the defendant specifically intended to damage a building." After the disputed portion of the instruction, the trial court, referring to the charge of first degree arson, again stated that the defendant must "have the intent to damage a building." In connection with the charge of second degree arson, the trial court reiterated the element of "intent to damage a building." The trial court further reiterated the requirement of proof of intent to damage a building, once with respect to arson in the second degree and twice with respect to first and second degree arson. In addressing the fifth count of attempted first degree assault, the trial court charged three times that intent to cause serious physical injury is a required element of proof. In its final charge, the trial court again instructed the jury that it must find that the defendant "intended to damage a building" with regard to the first and second degree arson counts, and "intended to cause serious physical injury" with regard to the attempted first degree assault count.

Under these circumstances, it strains reason to believe that the jury could have understood the challenged instructions as not requiring that the state prove beyond a reasonable doubt that the defendant intended to cause a specific result, either damage to a building with regard to the arson counts or serious physical injury with regard to the attempted first degree assault count. *State* v. *Austin,* supra, 244 Conn. 237; *State* v. *Prioleau,* supra, 235 Conn. 322; *State* v. *Maia,* 48 Conn. App. 677, 688, 712 A.2d 956, cert. denied, 245 Conn. 918, 717 A.2d 236 (1998). We conclude that the instructions of the trial court did not, in the context of the entire charge, deprive the defendant of his constitutional due

process right to a fair trial, nor did they result in any injustice. Therefore, the defendant was not deprived of his constitutional right to a fair trial, and may not prevail under *State* v. *Golding*, supra, 213 Conn. 239–40, because he has not demonstrated that an error of constitutional magnitude clearly exists. Furthermore, because there was no manifest injustice, the defendant's claim does not warrant plain error review. *State* v. *Jaynes*, 36 Conn. App. 417, 430, 650 A.2d 1261 (1994), cert. denied, 233 Conn. 908, 658 A.2d 980 (1995).

## III

The defendant's final claim is that the trial court improperly instructed the jury on the effect of his intoxication evidence. According to the defendant, the trial court charged that to negate specific intent, the intoxication evidence must show that the defendant was "incapable" of possessing the required intent, and that this incapacity was the threshold for consideration of his intoxication evidence. Specifically, the defendant claims that the trial court's instruction impermissibly informed the jury that, in determining whether he possessed the requisite intent for the crimes of arson in the first and second degree and attempted assault in the first degree, they could not consider the effect of intoxication unless the evidence of intoxication reached the threshold level of excluding the possibility of the defendant possessing such intent. The defendant contends that such an instruction placed the burden on him to persuade the jury of his intoxication beyond a reasonable doubt in violation of his constitutional right to due process of law. We disagree.

The defendant filed a request to charge regarding the evidence of intoxication. The defendant requested the trial court *not* to charge any of the following: "(a) 'intoxication' may be offered by the defendant whenever it is relevant to negate an element of the crime charged;

(b) any language that he was not mentally able even to form the specific intent to commit the crimes charged; (c) any language requiring the jury to find that the defendant was so intoxicated that his mind was incapable of forming the necessary intent; any language referring to the necessary result of the intoxication being incapable to form the necessary intent."

Our review of the defendant's claim requires that we examine the court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the inclusion of such instructions. *State* v. *Ortiz*, 217 Conn. 648, 661–62, 588 A.2d 127 (1991). "While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a court need not tailor its charge to the precise letter of such a request." Id., 662. "[A] charge to the jury is not to be clinically dissected nor are portions of the charge to be read in isolation from the entire instruction." (Internal quotation marks omitted.) *State* v. *Fernandez*, 27 Conn. App. 73, 87, 604 A.2d 1308, cert. denied, 222 Conn. 904, 606 A.2d 1330 (1992). "If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . Whether a charge is possibly misleading depends on the substance rather than the form of what is said." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, supra, 662.

Rather than leaving the jury to its own devices in assessing the role of intoxication in the case, the trial court provided the jury with an accurate and comprehensive explanation of the relationship between the state's burden of proving the element of specific intent and the defendant's evidence of his intoxication. See *State* v. *Fernandez*, 27 Conn. App. 84–85. Our review of the charge as a whole discloses that it is not reasonably possible that the jury was misled as to the scope of the

state's burden of proof on the element of specific intent and the relationship of intoxication to that burden.

At the beginning of its instruction on intoxication, the trial court reminded the jury that the defendant had presented testimony to the effect that he had been intoxicated at the time of the crime. The trial court recited the statutory definition of the word "intoxication"; see General Statutes § 53a-7;[25] and then instructed the jurors that if they found that the defendant was under the influence of an intoxicant at the time of the crime, they must then determine what effect, if any, his intoxication had on his ability to form the specific intent required to commit the crimes charged. The trial court further recited the statutory explanation of the role of intoxication and the relevance of evidence thereof in a prosecution for a specific intent offense: "Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged." See footnote 25. Immediately thereafter, the trial court carefully described how § 53a-7 applied in the context of this case and in connection with the defendant's evidence of his intoxication: "If you find that the defendant was intoxicated at the time of the crime, you may take this fact into consideration in determining whether he was in such a state of intoxica-

[25] General Statutes § 53a-7 provides: "Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged, provided when recklessness or criminal negligence is an element of the crime charged, if the actor, due to self-induced intoxication, is unaware of or disregards or fails to perceive a risk which he would have been aware of had he not been intoxicated, such unawareness, disregard or failure to perceive shall be immaterial. As used in this section, 'intoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body."

tion so that he did not have the ability to form the required specific intent which is a necessary element for the commission of those crimes." The trial court instructed the jurors that they must first decide whether the defendant committed the acts the state alleged, second, whether the defendant was intoxicated at the time of the alleged crime and, third, whether he was incapable of possessing an intent to commit the various crimes. The trial court again reminded the jury that the state always has the burden of proving beyond a reasonable doubt that the defendant was capable of forming the required intent. Finally, the trial court instructed the jury that "[a]ny degree of intoxication, not merely total intoxication, may be considered in determining whether the defendant possessed the requisite intent."

Instructions similar or identical to the charge given here have been upheld by our Supreme Court in *State* v. *Austin*, supra, 244 Conn. 238–40, *State* v. *Ortiz*, supra, 217 Conn. 663, and *State* v. *Stevenson*, 198 Conn. 560, 571, 504 A.2d 1029 (1986), and by this court in *State* v. *Maia*, supra, 48 Conn. App. 683–85, *State* v. *Burgos*, 37 Conn. App. 404, 415, 656 A.2d 238, cert. denied, 233 Conn. 915, 659 A.2d 186 (1995), and *State* v. *Fernandez*, supra, 27 Conn. App. 85–86. Moreover, our Supreme Court has described such an instruction as a "correct . . . statement of law." *State* v. *Stevenson*, supra, 570. Under these circumstances, we conclude, as in *Fernandez*, that the trial court never suggested to the jury that it could not consider the evidence of intoxication unless it surpassed an improper evidentiary threshold, and correctly charged that the evidence of intoxication should be considered in conjunction with all of the other evidence bearing on the issue of intent. In addition, "[b]y instructing the jury that 'any intoxication' was relevant to whether the state had sustained its burden of proving that he possessed the requisite intent, the court made

clear that the evidence of intoxication need not preclude the possibility of his possession of that intent." *State* v. *Fernandez*, supra, 87. We therefore conclude that there was no reasonable possibility that the trial court's instructions, when viewed as a whole, could have misled the jury.

The judgment is affirmed.

In this opinion the other judges concurred.