**Mark BRUCE, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 316, 2000.**

Supreme Court of Delaware.

Submitted: May 8, 2001.
Decided: Sept. 13, 2001.

J. Brendan O'Neill, Esquire, Assistant Public Defender, Office of the Public Defender, Wilmington, Delaware, for Appellant.

Thomas E. Brown, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for the State.

Before VEASEY, Chief Justice, WALSH and HOLLAND, Justices.

VEASEY, Chief Justice.

In this appeal, we address the question whether a request for a continuance by a defendant in a criminal case operates as a waiver of the defendant's right to a trial within 180 days under the Interstate Agreement on Detainers. We hold that a defendant waives the right to a speedy trial under the detainer agreement only if the defendant expressly agrees to or acquiesces in a trial date outside the 180–day time limit. Thus, where the defendant requests a continuance but does not agree to a trial date outside the time limit, the time limit is tolled. Because the defendant in this case requested a continuance but did not agree to a trial date outside the time limit, we conclude that he did not waive his rights under the detainer agreement.

We nevertheless conclude that, in the circumstances of this case, the trial court's final decision to postpone the start of trial beyond the (appropriately tolled) time limit complied with terms of the detainer agreement because the postponement was for good cause and "in open court." We find no reversible error on any of the other issues raised in this appeal. Accordingly, we affirm the judgment of the Superior Court.

### Facts

At about 10:15 a.m. on September 17, 1998, two armed men in masks entered a bank in Talleyville, Delaware, and ordered the bank employees and customers to get on the floor. The two robbers took several bags of cash from the bank and escaped in a white Chevrolet Cavalier driven by a third person. Several witnesses saw the car in the bank's parking lot around the time of the robbery. One witness, Karen Ramsey, saw two men in a white car parked near the bank. She later found a sack of money with an exploded dye pack and turned it over to the police. A second witness, Nina Parker, noticed "red stuff"— apparently tear gas from an exploded dye pack—coming from a white car as it pulled out of the parking lot. She then saw a passenger in the car throw a bag out a window. Parker testified that the car quickly pulled over and the occupants fled the scene. She saw at least one of the occupants get into a black Lexus that had pulled up next to the car. A third witness, Daniel Carson, testified that he saw one of the occupants of a white car discard a hat and a handgun while the car was moving. Carson retrieved the hat and gun and turned them over to the police.

During the ensuing investigation, the police recovered the getaway car and eventually traced latent fingerprints on the car to Mark Bruce. Several days after the robbery, Nina Parker identified Bruce from a photographic line-up as one of the occupants of the getaway car, but she testified at trial that she was not certain of the identification. Bruce was eventually charged with first-degree robbery, possession of a firearm during the commission of a felony, second-degree conspiracy, and wearing a disguise during a robbery. Af-

ter his trial in March 2000,[1] the jury convicted Bruce on all counts, and the trial court sentenced him to fifteen years in prison followed by probation.

### The Right to a Speedy Trial under the Interstate Agreement on Detainers

Bruce first argues that the trial court violated his right to a speedy trial under the Interstate Agreement on Detainers, codified at 11 *Del. C.* ch. 25.[2] Under 11 *Del. C.* § 2542, once the State indicts a prisoner who is incarcerated in another state and files a detainer[3] for the prisoner, the prisoner may file a request for "final disposition" on the Delaware charges. Upon filing this request, the State must bring the prisoner to trial within 180 days "provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."[4] Bruce argues that the 180–day time limit expired before his trial began on March 16, 2000 (excluding a three-month delay attributable to confusion over Bruce's representation during which the time limit was tolled). The State counters that Bruce's "unqualified request for a continuance" in July 1999 operated as an automatic waiver of his rights under the detainer agreement.

The basic timeline of events relating to this issue is undisputed. On October 26, 1998, the State charged Bruce with participating in the September 18, 1998 robbery and, shortly thereafter, issued a warrant for his arrest. While Bruce was incarcerated in Pennsylvania on unrelated charges, the State transported Bruce to Delaware for an arraignment on May 4, 1999. At the arraignment, the Public Defender's Office was appointed to represent Bruce and the 180–day clock under the detainer agreement began to run.

The Superior Court scheduled Bruce's trial to begin on August 3, 1999. During a case review on July 6, 1999, Bruce notified the court that he and his family intended to retain private counsel from Pennsylvania to represent him at trial. By July 26, 1999, however, Bruce's Pennsylvania counsel had not entered an appearance for Bruce,[5] and the trial court concluded that the public defender was still Bruce's counsel. Because the public defender had not prepared for the August 3rd trial, he requested a continuance at the July 26, 1999 hearing. The court granted counsel's request and, on October 22, 1999, the court rescheduled Bruce's trial for January 27, 2000. In the scheduling order, the court allowed the parties two weeks to notify the court of any conflicts and/or witness unavailability on the scheduled date.[6]

On November 15, 1999, the State notified the trial court by email that it

1. The trial was originally scheduled for August 3, 1999, but confusion surrounding Bruce's representation and other scheduling problems resulted in several postponements. These events are described in more detail below.

2. The detainer agreement is a "congressionally sanctioned interstate compact" between forty-eight states, the United States, and the District of Columbia enacted pursuant to the Compact Clause of the federal constitution. *See* U.S. Const. art. 1, § 10 cl. 3; *New York v. Hill*, 528 U.S. 110, 111, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000). As a consequence, the detainer agreement "is a federal law subject to federal construction." *Hill*, 528 U.S. at 111, 120 S.Ct. 659.

3. A detainer is a request by the receiving state for the sending state to detain the prisoner or to send notification when the prisoner is about to be released.

4. 11 *Del. C.* § 2542(a).

5. Bruce's Pennsylvania counsel filed a motion to appear *pro hac vice* on July 16, 1999, but the Superior Court rejected the motion as defective.

6. *See State v. Bruce*, Del.Super., Cr. A. Nos. IN98–10–0701 through –0708 (Oct. 22, 1999) (ORDER).

could not go to trial on January 27th because of scheduling conflicts.[7] In a December 10, 1999 order, the court rescheduled the trial for March 16, 2000.[8] Defense counsel immediately objected to the new date via email, arguing that the date exceeded the 180–day time limit. In response to the objection, in a February 7, 2000 bench ruling the court scheduled the trial for February 10, 2000. During a scheduling hearing the next day, the State informed the court that several witnesses would be unavailable on February 10th, and the trial court scheduled the trial to begin on March 16, 2000.

Defense counsel moved to dismiss Bruce's indictment because (1) the new trial date fell outside the 180–day limit and (2) the trial court's December 10, 1999 decision to schedule the trial for March 16, 2000 was not made after a hearing "in open court" as required by 11 *Del. C.* § 2542(a). The Superior Court held that the only continuance granted during the case was the continuance requested by the defense in July 1999 and that Bruce had waived his right to be brought to trial within 180 days by requesting that continuance.[9]

■ The first question raised under the detainer agreement is whether the July 27, 1999 continuance requested by the public defender operated as a waiver of Bruce's rights under the statute or merely tolls the 180–day time limit. The United States Supreme Court held in *New York v. Hill* that defense counsel may waive the defendant's right to a speedy trial under the detainer agreement by agreeing to a trial date outside the 180–day limit.[10] But the Supreme Court in *Hill* did not hold that *any* request for a continuance operates as a waiver of the defendant's rights. The holding in *Hill* implicitly contemplates a waiver only where the defendant makes a request or agrees to a government request for a continuance that is "inconsistent with the IAD's time limits."[11] In contrast, where a defendant requests a continuance

---

7. Correspondence by email with the Court, like letters, must be copied to all counsel of record, the Prothonotary and docketed.

8. *See State v. Bruce*, Del.Super., Cr. A. Nos. IN98–10–0701 through –0708 (Dec. 10, 1999) (ORDER).

9. *See State v. Bruce*, Del. Super, Cr. A. Nos. IN98–10–0701 through –0708 (Feb. 15, 2000) (Mem.Op.) at 5–7.

10. *See Hill*, 528 U.S. at 114–18, 120 S.Ct. 659. The Court therefore rejected the argument that the right may be waived only if the defendant makes an *affirmative* request for a continuance that is inconsistent with the 180–day limit. *See id.*

11. *Id.* at 118, 120 S.Ct. 659. The *Hill* Court cites three state cases on this point, all of which indicate that a waiver requires a request or an agreement to a request for a trial date beyond the 180–day limit. *See, e.g., People v. Jones*, Mich.App., 197 Mich.App. 76, 495 N.W.2d 159, 160 (1992) (finding a waiver if the prisoner "either expressly or impliedly, agrees or requests to be treated in a manner contrary to the terms of the IAD"); *Brown v. Wolff*, 9th Cir., 706 F.2d 902, 907 (1983) (finding a waiver if the prisoner "affirmatively requests to be treated in a manner contrary to the procedures prescribed by the IAD"); *Drescher v. Superior Ct.*, Cal.App., 218 Cal. App.3d 1140, 267 Cal.Rptr. 661, 666 (1990) (finding a waiver if there is a "showing of record that the defendant or his attorney freely acquiesced in a trial date beyond the speedy trial period"). Courts following *Hill* have acted in a manner consistent with this rule. *See, e.g., State v. Ward*, Ohio Ct.App., 2000 WL 1370993 at *3 (Sept. 25, 2000) ("The IAD time requirements were waived when counsel for appellee agreed to a trial date beyond the statutory time period."); *State v. Onapolis*, W.Va.Supr., 208 W.Va. 521, 541 S.E.2d 611, 615 (2000) ("We, therefore, hold that a defendant waives his or her rights under the IAD when the defendant or defendant's counsel requests or agrees to a trial date outside the statutory time limits."); *Ward v. Com.*, Ky. Ct.App., — S.W.3d —, 2001 WL 282708 at *5 (March 23, 2001) (applying its interpretation of *Hill* "that a defendant

that is consistent with the time limits under the statute, the 180–day limit is tolled for the duration of the delay rather than waived completely.[12]

Applying this analysis to the present case, we conclude that the July 27, 1999 defense request for a continuance tolled the 180–day limit until the confusion about Bruce's representation was resolved.[13] The public defender's request for time to prepare a defense did not operate as a waiver of the time limit under the detainer agreement because Bruce did not agree to a trial date outside the time limit. This is therefore not a case in which the defendant "willingly accept[ed] treatment inconsistent with the IAD's time limits, and then recant[ed] later on."[14]

The next question is whether the trial court's actions violated Bruce's rights un-der the detainer agreement. Bruce argues (1) that the March 16 trial date violated his right to a speedy trial and (2) that the trial court's December 10, 1999 decision to schedule the trial for March 16th violated the detainer agreement's "open court" and "good cause" requirements.[15]

Section 2542(a) provides that the trial court "may grant any necessary or reasonable continuance" beyond the 180–day limit "for good cause shown in open court." Although the trial court found that the continuance requested by the defense was the only continuance granted before trial,[16] we think that the trial court's decisions to postpone the January 27, 2000 and February 10, 2000 trial dates are best characterized as "continuances" granted at the State's request over Bruce's objection.[17]

implicitly waives the IAD's time limits where he or his counsel agrees to a trial date outside those limits"); *State v. Weatherspoon*, Minn. Ct.App., 2000 WL 228413 at *3 (Feb. 29, 2000) ("We conclude that like the defendant in Hill, Weatherspoon waived his right to a trial within 180 days of his request for final disposition by stating he was not seeking a speedy trial and then acquiescing to proceedings outside the time period required by the IAD.").

12. *See* 11 *Del. C.* § 2545(a) ("In determining the duration and expiration dates of the time periods provided in §§ 2542 and 2543 of this title, the running of the time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter."); *Naughton v. State*, Del.Supr., 453 A.2d 796, 798 (1982) (quoting approvingly trial court's ruling that "the 120 day period required trial 'by July 21, 1981, unless the period was tolled by the granting of a continuance for good cause shown in open court' ") (internal quotation marks omitted); *see also Ullery v. State*, Okl.Cr.App., 988 P.2d 332, 342 (1999) ("We find it reasonable to toll the IADA limits where the defendant requests or agrees to, and benefits from, the delay."); *State v. Onapolis*, W.Va.Supr., 208 W.Va. 521, 541 S.E.2d 611, 615 (2000) ("We, therefore, hold that the time limits contained in the IAD are tolled

when a defendant or defense counsel requests or agrees to a delay in the defendant's trial.); *People v. Meyers*, Mich.App., 124 Mich.App. 148, 335 N.W.2d 189, 191–92 (1983) ("[T]he 120–day time period may be tolled: (1) for any period which is the result of any necessary and reasonable continuance for good cause shown in open court with the defendant or his counsel present, (2) for any period during which the defendant is unable to stand trial, and (3) for any period of delay caused by the defendant's request or in order to accommodate the defendant."). Similarly, the *Hill* Court observed that, in that case, "[d]efense counsel filed several motions, which, it is uncontested, tolled the time limits during their pendency." *Hill*, 528 U.S. at 112.

13. We assume, without deciding, that the confusion was resolved on October 22, 1999, when the trial court issued its first order rescheduling Bruce's trial.

14. *Hill*, 528 U.S. at 118, 120 S.Ct. 659.

15. 11 *Del. C.* § 2542(a).

16. *See Bruce*, Mem. Op. at 5.

17. A "continuance" in this context is defined as "[t]he adjournment or postponement of a

■ Even assuming that the trial court's December 10, 1999 decision to postpone the trial was not made "in open court" [18] and that the March 16, 2000 trial date was outside the statutory 180–day period, we conclude that the February 8, 2000 postponement setting the final date for trial was for good cause and complied with the "in open court" requirement of Section 2542. Since counsel for the defendant and counsel for the State were both present at the February 8th scheduling conference, the conference was "in open court." [19] Moreover, the postponement was granted for good cause because the State's witnesses could not appear on the scheduled dates in February.[20] As a consequence, the March 16th trial date was set in accordance with the statute, and any procedural defects before that point did not prejudice Bruce's right to a speedy trial under the detainer agreement.

trial or other proceeding to a future date." Black's Law Dictionary 316 (7th Ed.1999). On both occasions, the trial court set a date for the start of the trial and then postponed the date at the request of the State. *Cf. State v. Burrus*, Ariz.App., 151 Ariz. 572, 729 P.2d 926, 933 (1986) (finding that postponement requested by defendant was a "continuance" although not made "in open court" and not labeled as a continuance).

18. We therefore do not address the question whether the "in open court" requirement in the detainer agreement permits the trial court to set a trial date subject to objections that the parties raise by correspondence.

19. In *Elliotte v. State*, Del.Supr., 515 A.2d 677, 678–79 (1986), we observed that the purpose of "the [open court] requirement is 'to prohibit *ex parte* and *sua sponte* continuances." ' (quoting *United States v. Ford*, 2nd Cir., 550 F.2d 732, 743 n. 30 (1977), *aff'd sub nom.*, *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978)). The *Elliotte* Court concluded that an "[office] conference in the presence of the defendant's counsel amounted to substantial compliance with the 'in open court' requirement since it occurred at defendant's request and in an adversarial context." *Id.* at 678.

### Admission of Hearsay Statements by Bruce's Sister under the Excited Utterances Exception

■ The second argument that Bruce raises on appeal concerns the trial court's admission in evidence of a hearsay statement by Towanda Bruce, the Defendant's sister. An officer testified at trial that, upon seeing still photographs taken by the bank surveillance system, Towanda—who was unaware that her brother was a suspect in the robbery—began to cry and stated that the robber in the photographs looks like her brother.[21] The police conducted a second, taped interviewed with Towanda fifteen minutes later during which she repeated that remark. The trial court admitted both the officer's testimony and Towanda's taped statement under the hearsay exception for excited utterances [22] or, alternatively, under the present sense

20. *See Wells v. State*, Del.Supr., No. 288, 1991, Holland, J., 612 A.2d 159, (1992) (ORDER), Order at ¶ 10 (finding "good cause" for continuances beyond the statutory limit because various State witnesses were unavailable).

21. During the robbery investigation, the police identified the owner of the car used in the robbery as Rhonda Bowie. The police notified Bowie that her car had been impounded by the police, and Towanda Bruce accompanied Bowie to the impound lot to retrieve the car. The police brought Bowie and Towanda to the police station and questioned each of them separately. During Towanda's interview, the police showed her photographs that were taken by surveillance cameras in the bank during the robbery. Towanda was not available to testify at Bruce's trial.

22. *See* D.R.E. 803(2) (providing for the admission of excited utterances, which are defined as "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition").

impression exception.[23] We review the Superior Court's decision to admit or exclude evidence for an abuse of discretion.[24]

To establish the admissibility of an excited utterance under D.R.E. 803(2), the proponent must show that: (1) the excitement of the declarant was triggered by a startling event; (2) the proffered statement was made while the excitement of the event was continuing; and (3) the statement was related to the event.[25] There is no requirement that the statement be made within a specific time after the triggering event. Instead, Rule 803(2) requires "the declarant to be under the 'stress of excitement' caused by the startling event or condition at the time of the statement's making." [26]

In his Reply Brief, Bruce concedes that Towanda's initial reaction to the photograph fits within the exception for excited utterances. According to the officer's testimony, Towanda immediately began to cry when confronted with the surveillance photograph. Since her statement that the robber looks like her brother was a spontaneous reaction triggered by viewing the photograph, the officer's testimony describing Towanda's reaction is admissible under D.R.E. 803(2).

Although Towanda's later taped statement was in some respects a reenactment of her first statement, we conclude that the trial court did not abuse its discretion in admitting the taped statement as an excited utterance.[27] The trial court found that Towanda made the taped statement while she was "still under the influence of the startling event of having been presented with the photograph of [her] brother." Although the taped statement was made fifteen minutes after Towanda first saw the photograph, the trial court could properly find that the statement was nevertheless an excited utterance made "under the 'stress of excitement.' "[28]

Moreover, because Towanda's statements fall within the excited utterance exception to the hearsay rule, their admission does not violate Bruce's confrontation rights. It is well established that the hearsay exceptions for spontaneous statements, which include the exceptions for present sense impressions and excited utterances, are firmly rooted under the confrontation provisions of the Delaware and federal constitutions.[29] Statements that fall within a firmly rooted hearsay exception satisfy the Confrontation Clause and do not require an individualized determination that the statements contain "particularized guarantees of trustworthiness." [30]

**23.** *See* D.R.E. 803(1) (permitting the admission of a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter").

**24.** *See Williamson v. State*, Del.Supr., 707 A.2d 350, 354 (1998).

**25.** *See Warren v. State*, Del.Supr., 774 A.2d 246, 253 (2001) (quoting *Gannon v. State*, Del.Supr., 704 A.2d 272, 274 (1998); *Culp v. State*, Del.Supr., 766 A.2d 486, 489–90 (2001)) (internal quotation marks omitted).

**26.** *See Culp*, 766 A.2d at 490.

**27.** *See* 2 McCormick On Evidence § 272 (5th ed. 1999) ("[T]he ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event."); *Culp*, 766 A.2d at 490 (same).

**28.** *Culp*, 766 A.2d at 490 (citation omitted).

**29.** *See Warren*, 774 A.2d at 254 (citing *Gannon*, 704 A.2d at 275–77; *Williamson*, 707 A.2d at 355–56).

**30.** *See Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) ("Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception."); *see also Lilly v. Virginia*, 527 U.S. 116, 126, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (" '[A]dmission of virtually any evidence within [a firmly rooted exception] comports with the substance of the con-

■ Even assuming that the trial court erred in admitting Towanda's taped statement under an exception to the hearsay rule, and thus presumptively violated Bruce's Sixth Amendment right to confront the witnesses against him, we conclude that any error was harmless beyond a reasonable doubt [31] because the taped statement was entirely cumulative of the officer's admissible testimony describing Towanda's initial reaction to the surveillance photograph.

### Admission of Teletype Report Under the Business Record Exception

■ Bruce next argues that the trial court improperly admitted a computer printout from the National Law Enforcement Teletyping System ("NLETS") [32] indicating that the car used in the robbery was registered to Rhonda Bowie. The trial court admitted the printout under the business record exception to the hearsay rule.[33] Under Rule 803(6), the State was required to provide a proper foundation for admission of the record through the testimony of "the custodian or other qualified witness." [34] Because the State presented the testimony of a police officer who used the teletype service, rather than an NLETS employee, Bruce contends that the foundation for admission of the printout was inadequate.

■ In our view, a police officer who regularly relies on and is familiar with the NLETS teletype system is qualified to provide the requisite foundation for the admission of an NLETS printout under the business record exception.[35] Although an officer who uses these printouts cannot

---

stitutional protection." ') (quotation marks and citations omitted); *Capano v. State*, Del. Supr., 781 A.2d 556, 626(2001).

**31.** *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."); *see also Capano*, slip op. at 81–94.

**32.** NLETS is a private organization employed by law enforcement agencies to track vehicle registrations in other states. The Delaware police used NLETS to trace the ownership of the getaway car because the car was registered in Pennsylvania. NLETS reports do not fall within the public records exception to the hearsay rule because the reports are not made by a "public office or agency." D.R.E. 803(8); *cf. State v. McCullough*, La.App., 566 So.2d 635, 637–38 (1990) ("A careful study of the 13 teletypes ... suggests that [they] are subject to the public records exception to the rule excluding hearsay. The teletypes were prepared by Alabama law enforcement personnel whose duty assignments include locating and extraditing persons wanted by other jurisdictions. The issuance of the teletypes was effected as part of the regularly conducted and regularly recorded activities of these law enforcement personnel. There are no factual findings or investigative conclusions in the teletypes. The material is limited to basic or primary facts.").

**33.** D.R.E. 803(6) provides for the admission of:

> A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

**34.** D.R.E. 803(6).

**35.** *See, e.g., People v. Miller*, N.Y.App. Div., 150 A.D.2d 910, 541 N.Y.S.2d 257, 258 (1989) ("The record reveals that the [teletype] computer printout was properly authenticated [as a business record] by the investigating policeman as a document he obtained in the regular course of police business and, in fact, police computers are tied into Department of Motor

testify in detail about the data entry or record-keeping processes at NLETS, we conclude that the officer could have adequate knowledge of NLETS practices to be a "qualified witness" within the meaning of D.R.E. 803(6). In this case, however, the officer did not provide a sufficient foundation for the admission of the NLETS report under the business record exception. Indeed, he did not present *any* foundational testimony concerning the business practices at NLETS. Instead, the officer simply testified that he found NLETS reports to be accurate in the past. We therefore conclude that the trial court abused its discretion in admitting the teletype printout as a business record without the required foundational testimony.

 Nevertheless, we find that the court's error was harmless. The NLETS record merely identified Rhonda Bowie as the registered owner of the getaway car and implicated Bruce only by means of Bowie's friendship with Bruce's sister.[36] In any event, the State did not have to rely on the teletype evidence to link Bruce to the car because it presented independent evidence that Bruce's fingerprints were on the car and that Bowie was a friend of Bruce's sister. As a consequence, the ad-

mission of the NLETS record without proper foundation could not have prejudiced the defense and was harmless beyond a reasonable doubt.[37]

### Propriety of Comments in the State's Rebuttal Argument

Bruce's final argument is that the prosecutor made improper comments during the State's rebuttal argument. First, the prosecutor referred to the defense strategy as a "shotgun approach"[38] and then told the jury that its "concern is[:] should Mr. Bruce accept personal responsibility for taking a gun and sticking it in people's faces and taking their money." On appeal, the State contends that the remarks were merely "a colorful and dramatic way of saying that that the categories of evidence presented by the defendant were not persuasive and failed to undermine the state's proof of guilt beyond a reasonable doubt."[39]

 Because defense counsel did not object at trial to these remarks by the prosecutor, we review the remarks for plain error.[40] To constitute plain error, the prosecutor's improper statements must "be so clear and defense counsel's failure to object so inexcusable that a trial judge

---

Vehicle computers for that very purpose.") (citations omitted); *State v. Pace,* N.J.Super., 171 N.J.Super. 240, 408 A.2d 808, 814 (1979) ("The teletype which identified the stolen vehicle was admitted into evidence as a business record. There was a sufficient foundation established for its admission."), *abrogated on other grounds, State v. Lugo,* N.J.Super., 249 N.J.Super. 565, 592 A.2d 1234 (1991); *see also City of Seattle v. Heath,* Wash.App., 10 Wash.App. 949, 520 P.2d 1392, 1395–96 (1974) (admitting teletype records based on foundation testimony from the assistant director of the Traffic Violations Bureau of the Seattle Municipal Court, although "the testimony did not show how the exhibit was prepared and the information passed from one agency to the other").

**36.** Bruce did not appear to dispute at trial whether the car used in the robbery was registered to Bowie.

**37.** *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**38.** The prosecutor went on to explain: "A shotgun shoots a small number of small projectiles, and as they get further away they spread out, and the person that shoots the shotgun hopes that one or more of those little bullets will find or hit something."

**39.** *State v. Chasse,* Conn.App., 51 Conn.App. 345, 721 A.2d 1212, 1221 & n. 12 (1998), *cert. denied,* Conn.Supr., 247 Conn. 960, 723 A.2d 816 (1999).

**40.** *See Trump v. State,* Del.Supr., 753 A.2d 963, 964–65 (2000); *Robertson v. State,* Del. Supr., 596 A.2d 1345, 1356 (1991) (holding that, if not made at trial, objections to the State's rebuttal argument are deemed waived unless "substantial rights are jeopardized and the fairness of the trial imperiled"); *see also* Supr. Ct. R. 8.

... has no reasonable alternative other than to intervene *sua sponte* and declare a mistrial or issue a curative instruction." [41]

■ Both the prosecution and defense counsel necessarily have some license to present a forceful case.[42] Nevertheless, it is likely in most cases to be inappropriate for the prosecutor sarcastically to mock the defense case or to make comments that the jury should take the defendant's guilt as a foregone conclusion.[43] But we find that the prosecutor's comments in this case were not so extreme as to be clearly improper. Therefore, we conclude that the trial court did not commit plain error by failing to intervene *sua sponte*.[44]

Bruce further argues that the prosecutor misrepresented the evidence when he stated that

> [T]he proof in this case suggests that Mr. Bruce and his coconspirators borrowed a car from a person by the name of Rhonda Bowie, and we know that, the evidence suggests this possibility, because Rhonda Bowie when she came to pick up her car came with the defendant's sister. So the defendant and his cohorts borrowed a car.

The trial court allowed this argument over Bruce's objection. Bruce contends that this statement is misleading because there was no evidence that Bruce borrowed Bowie's car.[45]

■ In closing argument, a prosecutor may properly draw "legitimate inferences of the [defendant's] guilt that flow from the evidence." [46] The prosecutor may not, of course, misrepresent the evidence presented at trial.[47] In this case, we find that the evidence supports a reasonable inference that Bruce borrowed the car from Bowie. The State presented evidence establishing that (1) the getaway car was registered to Bowie, (2) Bowie was a

**41.** *Trump v. State,* 753 A.2d at 964–65.

**42.** As the State points out, defense counsel in this case employed some "colorful" language of his own during closing arguments—for example, comparing the State's fingerprint expert to "the guys who built the Titanic, [who said] this boat will never sink. Well, sure enough, the Titanic went down."

**43.** *See McCowan v. United States,* D.C.App., 458 A.2d 1191, 1197 (1983) (finding improper the prosecutor's statement that "it seems like [defense counsel] gives us a shotgun approach to the whole defense....").

**44.** *Cf. Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."). We also note that the trial court issued the standard jury instruction concerning argument by counsel: "[W]hat an attorney states in his or her opening or closing arguments is not evidence. consists of testimony from witnesses testifying from the witness stand and exhibits introduced through their testimony. It is this evidence only which you may consider in reaching your verdicts."

**45.** Bruce also notes that the prosecutor later stated that Bruce "borrowed a car from Towanda Bruce, his sister's friend...." Bruce argues that there was no evidence to suggest that Bruce borrowed a car from his sister. But it is clear from the prosecutor's statement that he confused the names of the relevant parties; indeed, he described Towanda Bruce as "[Bruce's] sister's friend." As a consequence, the prosecutor's mistaken assertion—although arguably confusing—was not improper or misleading.

**46.** *Hooks v. State,* Del.Supr., 416 A.2d 189, 204 (1980).

**47.** *See Hughes v. State,* Del.Supr., 437 A.2d 559, 567 (1981) ("It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.") (quoting *ABA Standards, Prosecution and Defense Functions* (1971)).

friend of Bruce's sister, and (3) Bruce's fingerprints were on the car. In addition, there was no evidence presented at trial to indicate that the car had been stolen from Bowie. Because the prosecutor clearly signaled that he was presenting an inference and described evidence supporting the inference, the prosecutor's argument on this point was not improper.

Bruce also argues that the trial court did not appropriately cure another statement by the prosecutor in which he attributed defense counsel's statements directly to Bruce himself. As the trial court implicitly recognized by sustaining the subsequent defense objection, the prosecutor's statement was improper because it constituted an implicit comment on Bruce's decision to exercise his right not to testify. But the trial court neutralized any prejudice from this remark by instructing the jury: "Ladies and gentlemen, the defendant doesn't speak. He has no obligation to speak. In fact, he's got a constitutional right not to speak. What you heard from his counsel was argument that his counsel made based on the evidence in the record...." The court then struck the offending comment, and the prosecutor apologized. This remedy was more than adequate to eliminate any prejudice.[48]

### *Conclusion*

For the foregoing reasons, we affirm the judgment of the Superior Court.

---

**48.** *Cf. Diaz v. State*, Del.Supr., 508 A.2d 861, 866 (1986) ("Even when prejudicial error is committed, it will usually be cured by the trial judge's instruction to the jury to disregard the remarks."), *abrogated on other grounds by Medina v. California*, 505 U.S. 437, 448, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); *Boatson v. State*, Del.Supr., 457 A.2d 738, 743 (1983) (holding that an immediate and thorough jury instruction to disregard an improper statement mitigated statement's effects); *Pennell v. State*, Del.Supr., 602 A.2d 48, 51 (1991) ("[W]e find that Pennell was not prejudiced by the prosecutor's remarks, which were promptly corrected by the trial judge....").